EMIL PETRIK, Plaintiff-Appellant, *v.* MONARCH PRINTING CORPORA-
TION, Defendant-Appellee.

First District (2nd Division)   No. 81—2732

Opinion filed December 21, 1982.

Gregory A. Stayart, of Sullivan & Associates, Ltd., of Chicago, for appellant.

Martha L. Ashenhurst and William M. McErlean, both of Chicago (Boodell, Sears, Sugrue, Giambalvo & Crowley, of counsel), for appellee.

JUSTICE PERLIN delivered the opinion of the court:

Plaintiff, Emil Petrik, filed a three-count complaint against defendant, Monarch Printing Corporation (Monarch), his former employer, alleging *inter alia* that he had been discharged from his position as vice-president in retaliation for his reporting suspicions of embezzlement of corporate funds to Monarch's president and chief operating officer, Herbert C. Hansen. The trial court dismissed Petrik's retaliatory discharge claim, which was set forth in counts II and III, for failure to state a cause of action. Count I, which sought damages for defendant's alleged breach of an oral contract, is still pending in the trial court and is not involved in this appeal. The sole issue presented for our review is whether Petrik's complaint set forth sufficient facts to state a cause of action for retaliatory discharge. For the reasons which follow, we conclude that it does, reverse the trial court and remand the cause for further proceedings.

Petrik alleged in his complaint that he was hired by Monarch in

1975 and that from 1975 until 1978 he was employed as the controller of the corporation. In 1978 Petrik was promoted to vice-president-finance in which position he earned a salary of $28,188 per year and was responsible for certain accounting and financing duties for Monarch "such as cost accounting, forecasting, pricing, budgeting, inventory control and preparation and review of financial statements."

In September 1978 Petrik, in the course of his duties as vice-president-finance, discovered a $130,000 "discrepancy" in Monarch's financial books and records. Petrik immediately informed Herbert C. Hansen, Monarch's president and chief operating officer, of the discrepancy and Hansen "orally requested" Petrik to investigate the source of the missing funds and hired an assistant to aid Petrik in this assignment. In pursuing his investigation, Petrik, in October 1978, discovered what he characterized as "misconduct" by Hansen and "certain unknown persons" in their purchase of Monarch's capital stock from John Selig, Monarch's chairman of the board. The specific allegations of misconduct set forth in Petrik's complaint are as follows:

> "(a) That the present management of defendant had agreed to purchase 51% of the capital stock of defendant from John Selig, Chairman of the Board of defendant, for a purchase price of about $640,000;
>
> (b) That 25% of the purchase price was to be paid by a loan obtained by the present management of defendant from LaSalle National Bank, Chicago, Illinois, with the remaining purchase price to be paid in 20 bi-monthly installments at an interest rate of 6% per year;
>
> (c) That the purchase price was to be totally paid out of personal, not corporate funds;
>
> (d) That some of the loan payments to LaSalle National Bank and some of the payments to John Selig had in fact been made from corporate funds of defendant, in direct violation of the purchase agreement; and
>
> (e) That the findings of plaintiff suggested embezzlement of corporate funds of defendant."

Petrik asserts in his complaint that he immediately notified Hansen of his findings and warned him that "officers and/or employees" of Monarch "might be involved in violation of the criminal laws of Illinois." Hansen replied that the contract for the purchase of Monarch's capital stock had been "changed" in June 1978 and he told Petrik "not to worry about anything." Between November 1978 and April 1979 Petrik repeatedly but unsuccessfully attempted to obtain a copy

of the purported revised contract.

According to his complaint, on April 6, 1979, Petrik was discharged by Richard Volpe, Monarch's vice-president and treasurer, in direct retaliation for his efforts to bring to Monarch's attention the evidence he had uncovered of possible embezzlement of corporate funds and to require Monarch to operate in compliance with the criminal laws of Illinois. In count II of his complaint, Petrik sought compensatory damages for his discharge; in count III, he asked for punitive damages, alleging that Monarch's conduct was malicious.

On July 13, 1981, Monarch moved to dismiss Petrik's complaint, which motion was granted with leave to amend on September 30, 1981. The trial court reasoned that there are two elements to a claim for retaliatory discharge: an employment-at-will status and acts that would clearly violate public policy. The trial court ruled that since Petrik did not allege that he had disclosed his suspicions of wrongdoing to the public authorities, his complaint merely alleged an internal corporate dispute which did not involve violations of public policy. The complaint was dismissed and Petrik was given leave to amend so that, if possible, he could add an allegation that he had reported his suspicions to the public authorities. Subsequently, the parties stipulated that Petrik did not report his discovery of alleged wrongdoing to the police or to any other law enforcement officials; that no criminal or quasi-criminal investigation was ever conducted as a result of any of the alleged wrongdoings; and that, to the best of his knowledge, Petrik was never a party to a criminal or quasi-criminal investigation of the matters alleged. Following the stipulation, Petrik's complaint was dismissed with prejudice.

■ On appeal, the ultimate issue to be decided is whether Petrik has alleged facts sufficient to set forth a claim for retaliatory discharge. As the trial court correctly noted, there are two elements to a claim for retaliatory discharge: at-will employment status and acts that violate public policy. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876.) There is no dispute that Petrik was an at-will employee. Thus the issue to be resolved is whether Petrik alleged facts which set forth acts by Monarch which were in violation of public policy.

Because the judgment below was entered upon allowance of defendant's motion to dismiss, all facts properly pleaded in the complaint must be taken as true. (*Fitzgerald v. Chicago Title & Trust Co.* (1978), 72 Ill. 2d 179, 187, 380 N.E.2d 790.) Further, it is well established that a cause of action should not be dismissed on the pleadings unless it clearly appears that no set of facts can be proved which will

entitle plaintiff to recover. *Fechtner v. Lake County Savings & Loan Association* (1977), 66 Ill. 2d 128, 133, 361 N.E.2d 575.

Until 1978 Illinois courts steadfastly adhered to the rule that an employment contract of unspecified duration is terminable at the will of either the employer or the employee. According to this rule, an employee could quit or be fired at any time, with or without cause, and no liability would arise for the termination. In *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353, however, Illinois joined a growing number of States which have recognized the tort of retaliatory discharge as an exception to the rule that at-will employment is terminable at any time for any or no cause. In *Kelsay*, our supreme court held that an at-will employee could not be dismissed for bringing a worker's compensation claim against her employer. The court ruled that such a retaliatory discharge offended the public policy embodied in the Illinois Workers' Compensation Act and, therefore, gave rise to a cause of action for compensatory and punitive damages.

Following *Kelsay*, several appellate court decisions in other districts appeared to severely limit the scope of the *Kelsay* doctrine. In *Palmateer v. International Harvester Co.* (1980), 85 Ill. App. 3d 50, 406 N.E.2d 595, *aff'd in part, rev'd in part and remanded with directions* (1981), 85 Ill. 2d 124, 421 N.E.2d 876, the Appellate Court for the Third District, in a divided opinion, upheld the trial court's dismissal of plaintiff's complaint in which he alleged that he was fired both for supplying information to local law enforcement authorities that a fellow employee might be in violation of the Illinois Criminal Code and for agreeing to assist in the investigation and prosecution of the employee, if requested. The appellate court refused to extend the tort of retaliatory discharge to include plaintiff's termination noting that the only Illinois cases applying the public policy exception to the at-will employment rule concerned workers' compensation claims. 85 Ill. App. 3d 50, 52.

Shortly thereafter, the same court, again in a divided opinion, narrowed *Kelsay's* holding by denying tort relief to a union employee who allegedly had been fired for filing a worker's compensation claim against his employer. (*Cook v. Caterpillar Tractor Co.* (1980), 85 Ill. App. 3d 402, 407 N.E.2d 95.) The court reasoned that the employee was not terminable at will because he had recourse against his employer under a collective bargaining agreement which permitted discharge only for just cause and allowed for arbitration to guarantee the parties' rights. Since filing a worker's compensation claim would not constitute just cause for dismissal, the employee was protected by the contract which, according to the court, provided his sole remedy.

(*Cook v. Caterpillar Tractor Co.* (1980), 85 Ill. App. 3d 402, 404-06; contra, *Wyatt v. Jewel Companies, Inc.* (1982), 108 Ill. App. 3d 840, 439 N.E.2d 1053.) The court held that before bringing an action on the contract, the employee had to exhaust his remedies under the contract by challenging his dismissal in a grievance procedure. His failure to do so precluded a contract action for retaliatory discharge. *Cook v. Caterpillar Tractor Co.* (1980), 85 Ill. App. 3d 402, 406-07.

In his dissent in *Cook*, Justice Barry distinguished between an allegation that Cook's discharge was unlawful because it violated the terms of the collective bargaining agreement and an allegation that his discharge was unlawful because it was in retaliation for pursuing his worker's compensation claim. Because the complaint involved the latter allegation and not the former, the dissent concluded that the cause of action sounded not in contract but in tort and could therefore be maintained under *Kelsay* independent of the employee's rights under the collective bargaining agreement. (85 Ill. App. 3d 402, 407.) Justice Barry stated, "[t]he result reached in this case and in *Palmateer v. International Harvester* (1980), 85 Ill. App. 3d 50, [406] N.E.2d [595], reflects a conservatism in matters of employer-employee relations which I find disturbing, and assures to employers that the tort of retaliatory discharge, although recognized by our supreme court, is virtually nonexistent in the Third District." 85 Ill. App. 3d 402, 409.

In *Rozier v. St. Mary's Hospital* (1980), 88 Ill. App. 3d 994, 411 N.E.2d 50, the Appellate Court for the Fifth District, also in a divided opinion and relying upon the third district's decision in *Palmateer*, held that discharging a nurse for informing a local newspaper of the allegedly immoral and improper acts of other hospital employees was not actionable. In analyzing *Kelsay*, the majority stated that "*Kelsay* was a decision of narrow applicability intended only to promote the public policy furthered by the Workmen's Compensation Act," and that "the cause of action recognized in *Kelsay* is and should be limited to discharge in retaliation for the employee's exercise of his rights under the Workmen's Compensation Act." 88 Ill. App. 3d 994, 998.

On April 17, 1981, the Illinois Supreme Court reversed that part of the third district's decision in *Palmateer* which had affirmed the dismissal of plaintiff's claim for retaliatory discharge. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876.) In so ruling, the supreme court cast considerable doubt on the narrow interpretation the foregoing appellate decisions placed on *Kelsay* and expanded the contours of the tort of retaliatory discharge in Illinois.

Ray Palmateer worked in a management position for Interna-

tional Harvester for more than eleven years. Aware of another employee's possible crimes, Palmateer approached local law enforcement authorities and offered to testify and gather additional evidence against the suspect employee. As a result, Harvester dismissed Palmateer citing as reasons for his discharge that Palmateer refused to comply with the company's requests not to supply law enforcement authorities with information and his agreement to assist in the investigation and prosecution of the employee, if requested. The circuit court granted defendant's motion to dismiss Palmateer's action for failure to state a cause of action which was affirmed by the appellate court in a divided opinion. *Palmateer v. International Harvester Co.* (1980), 85 Ill. App. 3d 50, 406 N.E.2d 595.

In reversing the appellate court on this issue, the supreme court examined public policy, which the court stated was "[t]he foundation of the tort of retaliatory discharge." The court characterized Palmateer's conduct—voluntary information to a law enforcement agency— as being "favored" by public policy and held that Palmateer had stated a cause of action for retaliatory discharge. *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 133.

Monarch purports to distinguish *Palmateer* on the ground that in *Palmateer* the employee notified public authorities of his suspicions while Petrik did not. Monarch argues that because Petrik did not inform public authorities of his suspicions, the instant case merely involves an internal dispute regarding the proper method of managing defendant corporation and that *Palmateer* is inapplicable because "it is only the political rights and duties of the State's citizens which *Palmateer* prohibits an employer from infringing." We do not agree with Monarch's characterization of the facts in the instant case as involving a mere internal dispute or with its limitations of *Palmateer* to "political rights."

In discussing the parameters of the tort of retaliatory discharge in Illinois, the supreme court observed that "there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal." (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 130.) The court acknowledged that:

> "[T]he Achilles heel of the principle [of the tort of retaliatory discharge] lies in the definition of public policy. When a discharge contravenes public policy in any way the employer has committed a legal wrong. However, the employer retains the right to fire workers at will in cases 'where no clear mandate of public policy is involved' [citation]. But what constitutes clearly mandated public policy?" 85 Ill. 2d 124, 130.

The supreme court, noting the absence of a precise definition for the term "public policy," surveyed cases from other States and found that where "a matter *** strike[s] at the heart of a citizen's social rights, duties, and responsibilities," the tort of retaliatory discharge has been allowed. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 130.) In finding that Palmateer had stated a cause of action, our supreme court held that "[t]here is no public policy more basic, nothing more implicit in the concept of ordered liberty [citation], than the enforcement of a State's criminal code," and that "public policy *** favors citizen crime-fighters." (85 Ill. 2d 124, 132.) The court stated that "there is a clear public policy favoring investigation and prosecution of criminal offenses." 85 Ill. 2d 124, 133.

In the instant case the crux of Petrik's complaint is clear. He alleged that in the course of performing his duties at Monarch he discovered a discrepancy in the corporation's financial records which he believed may have been due to criminal conduct; he investigated the source of the discrepancy and in an effort to force Monarch to comply with the Illinois Criminal Code he reported his suspicions to Monarch's management. Monarch then discharged Petrik allegedly to aid in the concealment of its wrongdoing and in retaliation for his efforts to ensure management's compliance with the requirements of the criminal law. Accepting, as we must, the truth of these allegations, it is apparent that Petrik's complaint involves something more than an ordinary internal dispute between an employee and his employer. It is equally apparent that the public policy considerations that underlie *Palmateer* also support Petrik's conduct.

In a recent case similar to the one at bar, the Connecticut Supreme Court found a cause of action for retaliatory discharge had been stated where plaintiff, the quality control director of defendant corporation, alleged that he had been discharged because he called to his employer's attention repeated violations of the Connecticut Uniform Food, Drug and Cosmetic Act. (*Sheets v. Teddy's Frosted Foods, Inc.* (1980), 179 Conn. 471, 427 A.2d 385.) The *Sheets* court found that the employee's termination violated public policy even though as the dissent in *Sheets* noted the employee did not inform the public law enforcement authorities of the corporation's alleged violations. (See also *Harless v. First National Bank* (W. Va. 1978), 246 S.E.2d 270, where the court held that an employer wrongfully discharged an employee who had notified his superiors at a bank of violations of various State and Federal consumer credit and protection laws.) We find *Sheets* persuasive and consistent with the national trend which evidences a growing judicial receptivity to the recognition of a tort cause of action

for retaliatory discharge. Accordingly, we conclude that Petrik has alleged facts sufficient to withstand a motion to dismiss.

For the foregoing reasons, we reverse the trial court's order dismissing counts II and III of plaintiff's complaint and remand the cause for further proceedings.

Reversed and remanded.

DOWNING and HARTMAN, JJ., concur.