EMIL PETRIK, Plaintiff-Appellant, v. MONARCH PRINTING CORPORA-
TION, Defendant-Appellee.

First District (2nd Division)   No. 85—1795

Opinion filed April 22, 1986.

Gregory A. Stayart, of Chicago, for appellant.

Freeborn & Peters, of Chicago (Leland W. Hutchinson, Jr., and Steven M. Hartman, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Plaintiff, Emil Petrik, appeals from a grant of summary judgment for defendant on his claim that he was the victim of a "retaliatory discharge," in violation of public policy. We affirm.

On April 6, 1979, plaintiff, Emil Petrik, was discharged from his employment with defendant, Monarch Printing Corporation, a closely held corporation. Plaintiff was hired by defendant in 1975, and held the position of controller at the firm until 1978, when he became vice-president—finance.

Following his termination, plaintiff filed the present suit. Plaintiff's second amended complaint consisted of three counts. In count I, plaintiff sought expenses and overtime pay allegedly accrued while he was a Monarch employee; in counts II and III, he alleged that his firing was a retaliatory discharge and sought compensatory and punitive damages. Specifically, plaintiff claimed that in September 1978, in the course of his duties, he discovered a $130,000 discrepancy in Monarch's financial books and records, and that he immediately informed Herbert C. Hansen, Monarch's president and chief operating officer. Plaintiff claimed that he later discovered what he characterized as misconduct by Hansen and others in their purchase of Monarch capital stock from John Selig, formerly Monarch's principal owner. Plaintiff alleged that the present Monarch owners had agreed to purchase the company from Selig for $640,000 and that 25% of this purchase price was to be paid for by a loan obtained from La Salle National Bank. Selig transferred his final shares in June 1978 to Herbert Hansen and John H. Crewdson, who became the sole shareholders, with Hansen owning a majority of the stock. According to the complaint, the purchase price was to be paid totally out of personal funds, but plaintiff alleged that some of the loan payments and some payments to Selig were improperly made from Monarch's own corporate funds. Because plaintiff did not allege that he had reported his suspicions of wrong-doing to the authorities, the circuit

court granted defendant's motion to dismiss. This court reversed. (*Petrik v. Monarch Printing Corp.* (1982), 111 Ill. App. 3d 502, 444 N.E.2d 588.) This court stated:

> "In the instant case the crux of Petrik's complaint is clear. He alleged that in the course of performing his duties at Monarch he discovered a discrepancy in the corporation's financial records which he believed may have been due to criminal conduct; he investigated the source of the discrepancy and in an effort to force Monarch to comply with the Illinois Criminal Code he reported his suspicions to Monarch's management. Monarch then discharged Petrik allegedly to aid in the concealment of its wrongdoing and in retaliation for his efforts to ensure management's compliance with the requirements of the criminal law. Accepting, as we must, the truth of the allegations, it is apparent that Petrik's complaint involves something more than an ordinary internal dispute between an employee and his employer." 111 Ill. App. 3d 502, 508, 444 N.E.2d 588, 592.

After remand from this court, defendant made a motion for summary judgment in the circuit court and filed affidavits from its officers together with other documentary evidence. The circuit court held a hearing on defendant's motion on May 1, 1984. Plaintiff's counsel conceded that he had no evidence of embezzlement. Further, plaintiff admitted in a deposition that the $130,000 discrepancy that he had alleged in his complaint was actually due to missing documentation for items otherwise recorded in the company's ledger, and apparently most of this documentation has now been pieced together. Plaintiff's counsel also admitted that he was not asserting any tax or securities law violations on the part of defendant's owners or officials.

The circuit court granted summary judgment on counts II and III of plaintiff's complaint, but withheld decision on count I, the overtime claim. On July 11, 1984, plaintiff filed a separate action against defendant, alleging that defendant improperly destroyed financial records pertinent to this litigation. The circuit court consolidated the new suit with the present one. On June 3, 1985, after the hearing on the motion, the circuit court denied plaintiff's motion to vacate the summary judgment, but certified, pursuant to Supreme Court Rule 304(a) (103 Ill. 2d, R. 304(a)), that there was no just reason to delay appeal from judgment on the second and third counts, although plaintiff's other claims were still pending. This appeal followed.

■ Because the circuit court granted summary judgment for defendant on plaintiff's claim, the issue on appeal is whether defendant has shown that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on that claim. (*Duffy v. Midlothian Country Club* (1980), 92 Ill. App. 3d 193, 197, 415 N.E.2d 1099, 1102.) In attempting to defeat defendant's motion for summary judgment, plaintiff cannot rest on his complaint but must submit affidavits and other documentary evidence to create an issue of fact. (*Zannis v. Lake Shore Radiologists, Ltd.* (1982), 104 Ill. App. 3d 484, 487, 432 N.E.2d 1108, 1110.) Although plaintiff has abandoned his embezzlement theory alleged in his second amended complaint, defendant did not object to the variance between plaintiff's pleading and proof, and hence any such defect is waived. *Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 518, 377 N.E.2d 21, 24; Ill. Rev. Stat. 1983, ch. 110, par. 2—612(c).

The Illinois Supreme Court first recognized the tort of retaliatory discharge in *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353. The court ruled that an employee at will could obtain compensatory and punitive damages if discharged for filing a workers' compensation claim, because of the strong public policy and comprehensive legislative scheme to compensate workers for work-related injuries. The court has subsequently handed down a series of rulings on retaliatory discharge in the workers' compensation area. See *Midgett v. Sackett-Chicago, Inc.* (1984), 105 Ill. 2d 143, 473 N.E.2d 1280 (employees under collective bargaining agreement can sue if discharged for filing for workers' compensation, because retaliatory discharge is a tort, not a contract action), *cert. denied* (1985), ____ U.S. ____, 87 L. Ed 2d 642, 105 S. Ct. 3513, and *cert. denied* (1985), 474 U.S. ____, 88 L. Ed. 2d 243, 106 S. Ct. 278; *Darnell v. Impact Industries, Inc.* (1984), 105 Ill. 2d 158, 473 N.E.2d 935 (employees can sue an employer if discharged for having filed a workers' compensation claim with a previous employer).

In the next important step in the evolution of the tort, the court held, in *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876, that a discharged employee stated a retaliatory discharge claim when he alleged that he was fired for supplying information to law enforcement officials that another company employee might be involved in a violation of the Illinois Criminal Code, and for agreeing to assist in the investigation and possible trial. Subsequently, in *Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 509-10, 485 N.E.2d 372, 376, the supreme court vindicated this court's earlier decision in this case (*Petrik v. Monarch Printing*

*Corp.* (1982), 111 Ill. App. 3d 502, 507-09, 444 N.E.2d 588, 592-93), that it is not necessary that employees be in actual contact with authorities before they can assert a retaliatory discharge claim stemming from suspicions of law violations. In *Wheeler*, the plaintiff claimed that he was discharged for refusing to work with a Cobalt 60 X-ray unit that was purportedly operated unsafely, in violation of Nuclear Regulatory Commission regulations.

On the other hand, the supreme court held, in *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 478 N.E.2d 1354, that no retaliatory discharge claim was stated because it is *not* the public policy of Illinois that free speech and other constitutional guarantees, binding on government, limit the hiring and firing decisions of private companies. Similarly, in a recent series of opinions, the court has held that there is no claim for retaliatory discharge based on age discrimination, because the Illinois Human Rights Act (Ill. Rev. Stat. 1985, ch. 68, pars. 1—101 through 9—102), provides the exclusive State remedy (*Mein v. Masonite Corp.* (1985), 109 Ill. 2d 1, 485 N.E.2d 312); that public policy does not preclude an employer from discharging an at-will employee for filing a claim under the employer's group health insurance plan (*Price v. Carmack Datsun, Inc.* (1985), 109 Ill. 2d 65, 485 N.E.2d 359), or from discharging emergency medical technicians who "expressed concern" to their employer, a private ambulance company, that a co-employee was not certified, as required by a city ordinance (*Gould v. Cambell's Ambulance Service, Inc.* (1986), 111 Ill. 2d 54, 488 N.E.2d 993). See also *Koehler v. Illinois Central Gulf R.R. Co.* (1985), 109 Ill. 2d 473, 488 N.E.2d 542 (retaliatory discharge claim of railroad employee terminated for filing an action under the Federal Employers' Liability Act, is preempted by Federal law); *Bartley v. University Asphalt Co.* (1986), 111 Ill. 2d 318, 328-29 (retaliatory discharge and conspiracy claims that are "substantially dependent" on terms of collective-bargaining agreement are preempted by Federal law).

To prevail on his claim for retaliatory discharge, plaintiff must show termination of employment for a reason that violates " 'clearly mandated public policy.' " (*Price v. Carmack Datsun, Inc.* (1985), 109 Ill. 2d 65, 67, 485 N.E.2d 359, 360.) Plaintiff now admits that he has no evidence of criminal law violations, so this case does not fall under the *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876, "citizen crime-fighter" exception to the employment-at-will doctrine. Nonetheless, plaintiff asserts that his termination was in violation of well-established public policy. Specifically, plaintiff argues that he was fired for trying to prevent four

acts of "wrongdoing" by Hansen, defendant's majority shareholder. First, plaintiff asserts that Hansen asked him to figure the monthly sales by Hansen and Crewdson, and pay both of them 8% of their gross sales, not as loans, but as bonuses, to be used to purchase new companies. Plaintiff contends that he told Hansen that the money should come from the payroll account rather than the general corporate account so that the proper withholding deductions could be made and Internal Revenue Service Form 1099 could be filed. Hansen replied that he would take care of the details later. Hansen's personal tax returns and the returns for Monarch for 1978 were prepared by the accounting firm of Ernst & Ernst (now known as Ernst & Whinney). Plaintiff argues that he was discharged for trying to ensure that the proper tax records were kept. However, despite the existence of voluminous tax and financial information in the record, plaintiff now concedes that he has uncovered no evidence that the tax laws have been violated.

Plaintiff next argues that Hansen improperly withheld information from him about Monarch's acquisition of another printing company, Chicago Aligraphy and Lithographing Corporation (Aligraphy). However, plaintiff does not claim that other Monarch officials were unaware of the acquisition or that the acquisition was concealed from outside auditors and never reflected on the company's financial statements. In fact, plaintiff admitted in an affidavit that he did "recall Mr. Hansen telling me in the fall of 1978 that Monarch was buying Aligraphy." However, plaintiff asserted that Hansen never told him other details of the transaction "regarding the accrued payments and inventory valuation" and that he was never given a copy of the contract. Plaintiff concluded, "Accordingly, the financial statements for Monarch which I later worked on between September and April 1979, did not accurately reflect Monarch's financial condition." Nonetheless, the audit report for Monarch for the fiscal year ended September 30, 1979, discloses that Monarch acquired Aligraphy and it lists a schedule of payment on notes Monarch made to finance the purchase. In addition, it indicates that 1% of Aligraphy sales to certain customers were to be deposited in trust for four years as deferred compensation to one former stockholder, and that 2.667% of net cash collected from sales to Aligraphy customers was to be paid to the former stockholders for a five-year period. Finally, it lists the combined inventories of Monarch and Aligraphy at the end of the year. Thus, it appears that the facts surrounding the Aligraphy transactions were widely available. Plaintiff's only contention is that he was personally prevented from reflecting the information on fi-

nancial statements that he prepared. It is difficult to conclude that the public policy of Illinois requires that a particular official in a closely held corporation have all the financial information of the company, as long as lenders and shareholders have the information.

Next, plaintiff suggests that Hansen was "milking the corporation." Specifically, plaintiff contends that Hansen demanded that plaintiff pay him $125 each week out of corporate funds as selling expenses and club dues. However, Hansen filed an uncontradicted affidavit stating that the clubs in question were longstanding clients of Monarch and that the company used the clubs to entertain business clients and conduct business whenever possible, in order to maintain contact with the clubs as clients. Given that there have been no tax reporting violations, even if we assume, *arguendo*, that the $125 per week that plaintiff set aside was not spent for company purposes (an assumption that is by no means supported by the record), the problem with plaintiff's argument that Hansen was "milking the corporation" is that Monarch was Hansen's corporation. As the circuit court asked plaintiff's counsel, "Does public policy in Illinois prevent a man from stealing from himself?" Plaintiff's counsel admitted that Crewdson, the only minority shareholder, received the same benefits and compensation as Hansen and was not being cheated. There is no contention that Monarch's creditors were deceived. Plaintiff contends that Hansen was breaching his fiduciary duty, but one is forced to ask, "Fiduciary duty to whom?"

Plaintiff also contends that Hansen used funds belonging to Monarch to pay for company shares purchased from Selig, rather than Hansen's own personal funds, as required by the stock transfer agreement between the two men. However, Hansen filed an affidavit stating that he never used Monarch corporate funds to satisfy any personal debts, and he attached bank statements and checks from his personal account representing the total payments on the amount due in 1978 on his loan from La Salle National Bank. In addition, a former partner of the accounting firm Ernst & Whinney, which conducted audits of Monarch for fiscal years 1978, 1979 and 1980, indicated that no evidence of corporate payments of stockholder obligations was uncovered.

Finally, plaintiff contends that he was fired for trying to prevent Hansen from changing the accounting "presentation" in Monarch's financial reports. Before he transferred Monarch stock, Selig entered into a separation agreement with Monarch whereby he would receive a bonus of 10% of Monarch's annual profits over his lifetime. Plaintiff asserted that the new form of accounting presentation was de-

signed to show that Monarch had earned no profit, in order to deprive Selig of his 10% bonus. Monarch's net income before taxes in 1976 was $198,702; in 1977, it was $238,240. However, in 1979, Monarch posted a net loss before taxes of $413,477. Plaintiff's expert witness, an accountant, filed an affidavit that this decline in profits could be due to a change in accounting presentation. Plaintiff argues that the Business Corporation Act of 1983 embodies a public policy that corporations keep accurate books and financial records. (See Ill. Rev. Stat. 1985, ch. 32, par. 7.75.) However, plaintiff's expert stated in an affidavit that he could not "dispute" the financial presentation, and plaintiff's counsel conceded at oral argument in this court and the circuit court that both the 1979 and earlier methods of accounting presentation comported with generally accepted accounting principles. There is evidence in the record that these changes were made at the behest of Ernst & Whinney, which required Monarch to indicate the amounts owed Selig as a liability and upgrade other liabilities totaling $228,819 from contingent liabilities to actual liabilities.

Plaintiff argues, nonetheless, that the change in accounting methods itself was improper, because the contract between Selig and Hansen provided that Monarch's profit should be calculated on a consistent basis. Plaintiff, however, has had difficulty explaining how an asserted breach of a private contract violates clearly mandated public policy. A contract is a voluntary reordering of economic relationships, and if one party to a contract concludes that it is not in its economic interest to honor the contract, he or she is at liberty to breach it. The other party can then resort to the remedies provided by contract law. Selig and Hansen were involved in extensive litigation in Federal court over the terms of Selig's departure and sale of the company, and entered into a sealed settlement to terminate the litigation. Now plaintiff seeks to insert himself into the relationship between Selig and Hansen as some sort of third-party beneficiary to Selig's separation agreement. There is no evidence that Selig or Monarch intended this result, and the public policy of Illinois does not require it.

This is not a case in which a bookkeeper was fired for refusing to make false bookkeeping entries. Indeed, plaintiff's charges against Hansen notwithstanding, Hansen stated in an affidavit that pursuant to advice from his auditors in January 1979 he hired Mr. Richard Volpe, a certified public accountant, to supervise Mr. Petrik and reorganize the accounting department. Hansen stated:

"Your affiant did not propose to anyone that Mr. Petrik be

discharged at that time nor did your affiant decide to discharge him. *** After working with Mr. Petrik for several months, *** Mr. Volpe recommended to your affiant that Mr. Petrik's employment be terminated. *** The decision to discharge Mr. Petrik was based entirely on Mr. Volpe's recommendation."

■ Plaintiff has not cited and our research has not uncovered any cases factually similar to this one that support his claim of retaliatory discharge. In response to affidavits provided by defendant, stating that plaintiff was incompetent, plaintiff provided affidavits from others attesting to his skill. The circuit court concluded that there was a disputed issue of fact as to plaintiff's competence. However, the burden is not on defendant to prove why plaintiff was fired. A retaliatory discharge action presents a narrow exception to what remains the general rule in Illinois that an employee at will can be fired for any reason or for no reason at all. (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525, 478 N.E.2d 1354, 1356.) (See also *Criscione v. Sears, Roebuck & Co.* (1978), 66 Ill. App. 3d 664, 669-70, 384 N.E.2d 91, 95 (lack of legitimate business reasons for discharge of employee was not tantamount to a violation of public policy).) To sustain his claim of retaliatory discharge, plaintiff must prove that his firing was in derogation of clearly mandated public policy. This he has failed to do. Indeed, getting plaintiff to explain, in his brief and argument before this court, just what public policy has been violated by his discharge has been like trying to pick up mercury with the fingers.

■ As Justice Simon noted in *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 421 N.E.2d 876:

"[U]nchecked employer power, like unchecked employee power, has been seen to present a distinct threat to the public policy carefully considered and adopted by society as a whole. As a result, it is now recognized that a proper balance must be maintained among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out.

By recognizing the tort of retaliatory discharge, *Kelsay [v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353] acknowledged the common law principle that parties to a contract may not incorporate in it rights and obligations which are clearly injurious to the public. [Citation.] *** But the Achilles heel of the principle lies in the definition of public policy. ***

[T]he employer retains the right to fire workers at will in cases 'where no clear mandate of public policy is involved.' (*Leach v. Lauhoff Grain Co.* (1977), 51 Ill. App. 3d 1022, 1026.) But what constitutes clearly mandated public policy?

. There is no precise definition of the term. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the state collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. (*Smith v. Board of Education* (1950), 405 Ill. 143, 147.) Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." 85 Ill. 2d 124, 129-30, 421 N.E.2d 876, 878-79.

Let us suppose that a majority shareholder of a closely held corporation tells the bookkeeper to buy a Mercedes and membership in the Union League Club, for company use, with corporate funds, and to aggressively breach a contract. The circuit judge in this case poignantly asked whether the bookkeeper could reply, "I'm going to buy a Ford Escort instead, I plan to honor the contract, and you should join the Ajax Club, it costs 90% less," and be assured, under Illinois law, of keeping his job? We think not.

Plaintiff has failed to show that he was fired for a reason striking at "the heart of a citizen's social rights, duties, and responsibilities" (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 130, 421 N.E.2d 876, 879). An internal dispute over which of two accounting methods is to be chosen by a closely held corporation, either of which is proper, and a fight over the calculation of the bonus to be paid to the corporation's former owner, cannot be said to be the type of dispute that affects the citizens of the State collectively.

The decision of the circuit court is affirmed.

Affirmed.

BILANDIC, P.J., and STAMOS, J., concur.