Frank G. BELLINE,
Plaintiff-Appellant,

v.

K–MART CORPORATION, a Michigan corporation, Defendant-Appellee.

No. 90–3331.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1991.

Decided July 31, 1991.

Rehearing and Rehearing En Banc
Denied Aug. 22, 1991.

Bogdan Martinovich, Ray & Glick, William J. Provenzano (argued), Provenzano & Associates, Libertyville, Ill., for plaintiff-appellant.

Allan E. Lapidus, Carol L. Van Hal (argued), Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Our task in this diversity case is to divine the contours of the rather amorphous Illinois common law tort of retaliatory discharge. Frank Belline brought suit against his former employer, K–Mart Corporation, claiming that he was fired from his job in retaliation for reporting to K–Mart management suspicious behavior on the part of his supervisor. K–Mart assumes the truth of Belline's allegations for the purpose of its summary judgment motion but responds that Belline's termination for his internal report regarding his supervisor's irregular conduct is not actionable as retaliatory discharge because it implicates no public policy. The district court entered summary judgment in favor of K–Mart, concluding that the type of disclosure Belline made does not warrant protection because it falls outside "the heart of a citizen's social rights, duties, and responsibilities." *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 15–16, 421 N.E.2d 876, 878–89 (1981). Because, by our reading, Illinois law encourages all citizens to ferret out and expose possible criminal activity in the workplace, we reverse.

## I.

Frank Belline was employed as resident assistant manager of the K–Mart store in Wheeling, Illinois from February 1984 until May 1988. On November 15, 1987, while Belline was on duty, a Rotary Club representative entered the store to retrieve goods that he claimed had been set aside for him by the store manager, Dennis Dobberke. After telephoning Dobberke at home to verify the transaction, Belline released the merchandise. Dobberke explained that an itemized list of the goods and a payment check were locked in his desk and assured Belline that he would record the transaction later that evening. Belline mentioned the unusual incident to two of his co-workers—Scott Timmons, store security manager, and Pamela Bryan, assistant manager. As a result, when Dobberke returned to the store, all three employees kept a vigilant eye upon him. None of the three, however, spotted Dobberke running a check through the cash register. To Belline's knowledge, moreover, no such check was ever processed.

Timmons relayed word of Dobberke's suspicious behavior to Larry Clark, regional security manager. When Clark summoned Belline to his office, Belline himself recounted the precise course of events. He also notified Clark of his discovery that Dobberke had been improperly authorizing payment to an employee for days that the employee did not work. Although Belline pursued the Dobberke inquiry through the appropriate professional channels, he never reported the matter to the police. After an internal investigation, Dobberke was ultimately demoted and transferred to Ames, Iowa.

Belline charges K–Mart with penalizing all three employees who played a role in exposing Dobberke's suspect activities— Timmons, Bryan and himself. In February 1988, shortly after the close of the Dobberke investigation, Timmons was demoted from security manager to stockperson, a job that entails unloading trucks and hauling shopping carts from the parking lot. Shortly thereafter, Timmons was transferred to Elgin, Illinois. In March 1988, Belline himself was put on probation and on May 11, 1988, he was discharged, allegedly for unsatisfactory performance. Belline claims that Dobberke's replacement, the

new store manager Tim Rommel, inadvertently let slip the reasons for his dismissal, bluntly stating: "You got Dobberke, I got you." Belline Dep. at 190. Finally, Belline maintains that Pam Bryan, the third participant in the investigation, was also demoted: in June 1988, Bryan was transferred from her position as resident assistant manager of the K–Mart Wheeling store to a post as a merchandise assistant at a much smaller store 330 miles away in Madison, Indiana.

Belline filed suit charging K–Mart with retaliatory discharge and breach of his employment contract. The district court granted summary judgment in favor of K–Mart on both claims. Dismissing Belline's disclosure as just an internal report divulging a possible violation of company procedure or a crime, the district court concluded that it raised no issue of public policy. *See* Mem. Op. and Order of Dist. Ct. at 4. Instead, because the district court deemed the report to involve a purely private matter, it held that Illinois law would not support Belline's cause of action for retaliatory discharge. The court also determined that Belline had no case for breach of employment contract because the K–Mart employee handbook never promised him any contract rights in continuing employment. On the contrary, numerous acknowledgments which Belline signed explicitly cautioned him that "nothing in this booklet should be interpreted as providing employment for any definite period of time as your employment is at will and can be terminated by yourself or the Company at any time with or without cause." *Id.* at 2.

Belline advances three arguments on appeal. First, he contends that the district court erred in holding that only those employees who report crimes to the police or other public officials may receive succor under Illinois law. He maintains, moreover, that the protective shield Illinois law extends over whistleblowers should not depend upon the magnitude of the crime reported. Finally, he argues that K–Mart breached the promise implicit in its Policy on Integrity and Conflict of Interest that no employee would be discharged for reporting questionable activities, such as the

removal of merchandise from a store without proper payment.

## II.

As usual, we review the district court's entry of summary judgment *de novo*, drawing all reasonable inferences in favor of the non-moving party, here Frank Belline. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In accordance with the Supreme Court's recent directive in *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), moreover, we review *de novo* the district court's interpretation of state law. In exercising our obligation to provide meaningful appellate review in diversity cases, we must strive to parse state law and, if necessary, forecast its path of evolution.

### A. Retaliatory Discharge

■ As a general rule, an employment contract of unspecified duration may be terminated at any time with or without cause. Because unfettered employer power may threaten the public welfare, however, Illinois law recognizes an exception to the general rule of at-will employment: it permits an employee who is dismissed in violation of a clearly mandated public policy to bring a cause of action for retaliatory discharge. Recognition of this tort strikes an appropriate balance among competing interests—the employer's interest in efficient operation of a business, the employee's interest in earning a livelihood and society's interest in the well-being of its citizens. *See Palmateer*, 52 Ill.Dec. at 15, 421 N.E.2d at 878.

■ The tort of retaliatory discharge comprises three distinct elements: first, an employee must establish that she has been discharged; second, she must demonstrate that her discharge was in retaliation for her activities; and, finally, she must show that the discharge violates a clear mandate of public policy. *See Hinthorn v. Roland's of Bloomington*, 119 Ill.2d 526, 116 Ill.Dec. 694, 696, 519 N.E.2d 909, 911 (1988). But, as the Illinois Supreme Court has observed,

the "Achilles heel of the principle lies in the definition of public policy." *Palmateer*, 52 Ill.Dec. at 15, 421 N.E.2d at 878. Struggling to articulate some formulation of the term, the *Palmateer* court declared that "public policy concerns what is right and just and what affects the citizens of the State collectively.... [A] matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Id.* at 52 Ill.Dec. at 15–16, 421 N.E.2d at 878–79.

■ Although no law compels an individual to step forward and communicate his suspicions regarding criminal activity, public policy clearly favors the exposure of crime. A society's fundamental concern for the lives and property of its citizens is embodied in the criminal code. But the risk of discharge may deter employees who reasonably believe that crimes have been committed from acting on the information. To encourage citizen crime-fighters, Illinois law thus shields employees who volunteer such information from retaliatory discharge. In *Palmateer*, for example, the Illinois Supreme Court held that an employee who alleged that he had been fired because he notified the local law-enforcement agency of his co-worker's possible violation of the state criminal code had stated a cause of action for retaliatory discharge. "There is no public policy more basic, nothing more implicit in the concept of ordered liberty ... than the enforcement of a State's criminal code," the court pronounced. *Id.* at 52 Ill.Dec. at 16, 421 N.E.2d at 879; *see also Johnson v. World Color Press, Inc.*, 147 Ill.App.3d 746, 101 Ill.Dec. 251, 498 N.E.2d 575 (1986) (allowing retaliatory discharge action by employee fired for disclosing what he believed to be violations of federal securities laws); *Petrik v. Monarch Printing Corp.*, 111 Ill.App.3d 502, 67 Ill.Dec. 352, 444 N.E.2d 588 (1982) (allowing retaliatory discharge action by employee who reported discrepancy in corporation's financial records which he believed may have been due to criminal conduct).

But K–Mart contends that Belline's report regarding Dobberke's activities is merely a matter of *private* concern, not a matter of *public* policy. This argument relies upon two points. First, K–Mart seizes upon the fact that Belline reported his suspicions only to K–Mart management, not to the police. Second, K–Mart insists that the trifling magnitude of the crime involved removes it from the public realm.

K–Mart's emphasis on the private character of the parties to whom Belline voiced his suspicions, however, is misplaced. The great majority of courts interpreting Illinois law hold that an employee who reports unlawful conduct to an employer is protected under the tort of retaliatory discharge. *See Parr v. Triplett*, 727 F.Supp. 1163 (N.D.Ill.1989) (allowing retaliatory discharge claim by employee who reported suspicions only to company management, not to police); *Hicks v. Clyde Fed. Sav. & Loan Ass'n*, 722 F.Supp. 501 (N.D.Ill.1989) (same); *Shores v. Senior Manor Nursing Center, Inc.*, 164 Ill.App.3d 503, 115 Ill. Dec. 946, 518 N.E.2d 471 (1988) (nurse reported wrongdoing to nursing home administrator); *Johnson*, 101 Ill.Dec. at 251, 498 N.E.2d at 575 (employee reported wrongdoing to management); *Petrik*, 67 Ill.Dec. at 352, 444 N.E.2d at 588 (same). *But see Zaniecki v. P.A. Bergner Co.*, 143 Ill. App.3d 668, 97 Ill.Dec. 756, 493 N.E.2d 419 (1986) (holding that employee fired for reporting criminal activity to employer did not state claim for retaliatory discharge). To hold otherwise would be to create perverse incentives by inviting concerned employees to bypass internal channels altogether and immediately summon the police. *See Hicks*, 722 F.Supp. at 504 ("Such a system would ... penalize well-intentioned employees who attempt to rectify wrongdoing internally prior to taking public action"). Thus public policy, as well as state law, favors an approach that would allow dutiful employees who report wrongdoing to their employers to bring retaliatory discharge claims. As Judge Aspen observed in *Parr v. Triplett*, 727 F.Supp. at 1166–67:

When an employee reports criminal activity to his employer, he helps to expose crime and facilitates the enforcement of the Illinois Criminal Code. Therefore, an

important public policy is hampered if he is discharged as a result. A report to an employer does not transform a violation of the Illinois Criminal Code from a matter of public concern into a private dispute. The employee who chooses to approach his employer should not be denied a remedy simply because a direct report to law enforcement agencies might effectuate the exposure of crime more quickly. This would be a nonsensical distinction.

Zealous in fulfilling his responsibilities, Belline immediately apprised Timmons, the store security manager, and Clark, the regional security manager, of Dobberke's irregular activities. Belline should not be penalized because he availed himself of internal procedures rather than notifying the police. In fact, as K–Mart conceded at oral argument, Belline would have violated store policy had he failed to pursue the incident through the proper commercial chain of command and instead taken his suspicions directly to the authorities. Although the Illinois appellate courts are not in complete agreement on this point, we believe that the Illinois Supreme Court would adopt the rational approach taken by most Illinois courts and allow the employee who diligently informs her employer of wrongdoing in the workplace to bring a claim for retaliatory discharge.

K–Mart's second argument fares no better. K–Mart contends that the nature and magnitude of the crime involved here transforms it from a public matter into a private dispute. But although there is no sharp line of demarcation dividing matters of public policy from those of purely private concern, one who exposes what appears to be a crime furthers public policy. Belline reported what he reasonably believed to be a crime—unauthorized removal of merchandise from the store without proper payment. That the illegal act may have involved only a paltry sum makes no difference, for public policy favors the reporting of crimes regardless of their magnitude. Yet because this case involves a possible theft, the dissent maintains that "[w]hether there was a crime depends entirely on K–Mart's rule; there is no state policy beyond willingness to enforce K–Mart's decisions." *Infra* at 197. Illinois law does not, however, support such a radical position. In *Palmateer*, for example, the employer similarly argued that the employee's report implicated no public policy because it may have involved nothing more than the theft of a two dollar screwdriver. The Illinois Supreme Court flatly rejected this argument, declaring that "The magnitude of the crime is not the issue here.... '[T]he employer is not so absolute a sovereign of the job that there are not limits to his prerogative.'" *Palmateer*, 52 Ill.Dec. at 17, 421 N.E.2d at 880.[1] Imagine a company that secretly sanctions graft or even embezzlement by high-level managers, perhaps because they are such effective employees that it is willing to keep them at any price. Under the dissent's rule, however, the vigilant employee who is discharged for reporting such apparent wrongdoing on the part of his manager would have no recourse under Illinois law.

Focusing upon its policy regarding the donation of goods to charitable organizations, K–Mart also contends that Dobberke's activities may not have been illegal. Yet an employee's retaliatory discharge claim should not turn on the happenstance of whether the irregular conduct she reports is actually criminal. Public policy favors the exposure of *apparently* criminal activity. That the questionable conduct may later prove to be authorized and therefore legitimate is not dispositive. Admittedly, this is a close case since Dobberke's

---

1. Nothing in the recent case of *Fellhauer v. Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991), indicates otherwise. In *Fellhauer*, the Illinois Supreme Court concluded that a city employee discharged by the mayor for protesting the delay of a favorable contract to purchase electricity did not state a claim for retaliatory discharge only because "the limited benefit that might be gained by recognizing a claim for retaliatory discharge in this instance is outweighed, in our view, by the separate concern articulated by the legislature in section 3–11–1 of the Illinois Municipal Code," which explicitly grants the mayor absolute discretion to discharge an appointed officer whenever the mayor believes that discharge would be in the municipality's best interest. *Id.* 154 Ill.Dec. at 655, 568 N.E.2d at 876.

removal of the goods might actually prove to be an authorized contribution to a charitable organization. We think the apparent illegality of the acts Belline reported, however, is sufficient for him to survive summary judgment. *See Hicks,* 722 F.Supp. at 503 n. 2 ("there is some support for the position that Hicks need not actually prove Clyde Federal violated the CRA or engaged in redlining in order to recover on his retaliatory discharge claim"); *Shores,* 115 Ill. Dec. at 951, 518 N.E.2d at 476 (allowing retaliatory discharge claim by nurse who reported what she believed to be instances of neglect at nursing home); *Johnson,* 101 Ill.Dec. at 254, 498 N.E.2d at 578 (allowing retaliatory discharge claim by employee who reported what he reasonably believed to be violations of federal securities laws).

The dissent raises several issues which are, of course, worthy of consideration under the circumstances of this close case. The facts here, however, do not suggest that K–Mart in any way condoned Dobberke's offense. In fact, Dobberke was ultimately demoted. There are hints in the record, moreover, that Belline was fired by a mid-level manager who was merely a friend of Dobberke. There is no indication that K–Mart's upper management ordered, or even was aware of, the firing of Belline, nor is there any indication that K–Mart sought to rid itself of an inefficient or troublemaking employee.

In any event, the dissent's argument creates an *ex ante/ex post* problem by encouraging companies to redefine the crime of theft after the fact to insulate themselves from liability for retaliatory discharge. By the dissent's reasoning, an employee who is fired as a troublemaker for reporting what he reasonably believes to be a crime to the proper authority within the company could *never* bring suit for retaliatory discharge because the company could always define the apparent crime out of existence. Perhaps (as is suggested by the facts of this case) the company disavows the occurrence of any crime only to cut its losses and avoid liability after a mid-level manager has already fired the vigilant employee. Or, to pose another hypothetical, what if a store manager brazenly backs his truck up to the loading dock and drives off with enough furniture and appliances to completely equip his new home? His employer may choose to overlook the whole thing simply because the manager is the boss' nephew, or a fishing companion, or even because he is too good a merchandiser to lose. The dissent apparently believes that an employer's willingness to turn a blind eye to otherwise criminal activity should legitimate the firing of an employee who reports what he perceives to be illegal conduct. Yet such a stance hardly furthers Illinois' acute interest in the enforcement of its criminal laws.

### B. Breach of Employment Contract

In addition to the retaliatory discharge exception to the general rule of at-will employment, there exists another qualification upon the employer's absolute power to terminate the employment contract. The presumption of at-will employment may also be overcome by proof that the parties contracted otherwise. In order to demonstrate that a handbook or policy statement creates enforceable contract rights, an employee must establish that:

(1) the language of the policy statement contains a clear promise,

(2) the policy statement is disseminated so that the employee is made aware of its contents and reasonably believes it to constitute an offer, and

(3) the employee accepts the offer by commencing or continuing to work after learning of the policy statement.

*See Duldulao v. Saint Mary of Nazareth Hosp. Center,* 115 Ill.2d 482, 106 Ill.Dec. 8, 12, 505 N.E.2d 314, 318 (1987).

Belline's second claim is that he was fired in violation of his employment contract. This argument is grounded in K–Mart's Policy on Integrity and Conflict of Interest, which recommends that employees immediately report activities of an unusual nature to management. Implicit in the policy statement, Belline argues, was a promise that he would not be terminated for complying with its terms. But Belline cannot rely upon the K–Mart Policy on Integrity and Conflict of Interest because

it contains no clear promise regarding the terms of his employment. In *Duldulao,* on the other hand, the plaintiff received a handbook assuring him that no permanent employee would be fired without three warnings and an investigation. Moreover, any promise implied by the K–Mart policy statement was negated by explicit disclaimers. Belline read and signed several acknowledgments clearly warning him that his employment could be terminated at any time with or without cause. The *Duldulao* court's decision to allow a breach of contract claim was premised upon the absence of any such disclaimer negating the promises made in the employee handbook. *See id.* 106 Ill.Dec. at 13, 505 N.E.2d at 319; *Bennett v. Evanston Hospital,* 184 Ill. App.3d 1030, 133 Ill.Dec. 113, 540 N.E.2d 979 (1989) (hospital employee handbook containing explicit disclaimer that it was not intended to create a contract of employment did not alter employee's at-will employment status).

### III.

Belline's breach of contract claim must fail because he can point to no clear promise modifying his at-will employment status. Belline also alleges, however, that he was discharged because he warned K–Mart management of what he reasonably believed to be a crime—removal of merchandise without proper payment. Assuming the truth of his allegations (as K–Mart does for the purpose of summary judgment), K–Mart is not entitled to judgment as a matter of law on Belline's retaliatory discharge claim. Illinois public policy protects vigilant employees who alert their employers to apparently criminal activity in the workplace. The district court's grant of summary judgment in favor of K–Mart is therefore AFFIRMED IN PART, REVERSED IN PART, and REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, Circuit Judge, dissenting.

Our case is a clone of *Zaniecki v. P.A. Bergner & Co.,* 143 Ill.App.3d 668, 97 Ill. Dec. 756, 493 N.E.2d 419 (3d Dist.1986) (Heiple, J.). Bergner fired an employee who complained within the firm that a managerial worker was stealing the firm's property. *Zaniecki* held that the firm did not violate Illinois' rule against retaliatory discharges. Today we say that *Zaniecki* was wrongly decided, even though no state court has disagreed with its outcome and its author now sits on the Supreme Court of Illinois, which has begun trimming the retaliatory discharge tort. *Fellhauer v. Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991).

*Fellhauer* unanimously holds that an employee fired for protesting the delay of a favorable public contract to purchase electricity may not obtain damages or reinstatement. Although the court conceded that public policy promotes obtaining power from the lowest bidder and assumed that a discharge of one who sought to achieve this end would undermine that public policy, the court also concluded that extending the tort of retaliatory discharge would infringe excessively on the employer's control of its work force. It limited *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353 (1978), and *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981):

> In both *Kelsay* and *Palmateer,* the court recognized that an employer could effectively frustrate a significant public policy by using its power of dismissal in a coercive manner. In those circumstances, recognition of a cause of action for retaliatory discharge was considered necessary to vindicate the public policy underlying the employee's activity, and to deter employer conduct inconsistent with that policy. Such compelling circumstances are absent here.

154 Ill.Dec. at 655, 568 N.E.2d at 876. *Fellhauer* saw the "public policy" rule of *Kelsay* and *Palmateer* as designed to protect the public from action by employers that wanted to undermine the statutory norm. *Fellhauer* also emphasized the importance of giving employers the ability to decide who shall work for them, 154 Ill. Dec. at 656, 568 N.E.2d at 877, a public

policy of Illinois that the majority's opinion slights. It is easy for a jury to mistake a pest, a busybody, for a champion of the law. Firms need to prune their work forces of persons who create more trouble than they are worth; time diverted from business means lower efficiency and higher prices for consumers, undermining still another public policy. Employers fearing litigation—with high legal fees and the risk of punitive damages—will keep troublesome and inefficient employees on the payroll. Everyone loses when that happens.

I agree with my colleagues that *Zaniecki*'s view of Illinois law is questionable to the extent it says that courts never protect workers who make reports within the firm (as opposed to reports to public officials). Several courts stand against *Zaniecki* on this. Yet what matters today is *what* Belline reported, not to whom he reported it. What Belline reported is that the manager of one of K–Mart's stores let a local Rotary Club obtain some merchandise without filling in the proper forms. On one reading this is an offense against the sanctity of K–Mart's record-keeping system. (Retailers need to know what became of the inventory, and K–Mart also may want to keep tabs on the total volume of charitable gifts. It is unsurprising that K–Mart demoted the manager.) On another reading this is "theft"—because theft is an unconsented taking, and K–Mart allowed managers to donate merchandise to charity only after using the right forms. But no matter which characterization we use, Illinois has no interest in the outcome independent of K–Mart's. Illinois has not tried to induce retailers to cleave to a particular path on gifts; K–Mart therefore is not using discharge to undermine any policy of Illinois. Whether there was a crime depends entirely on K–Mart's rule; there is no state policy beyond willingness to enforce K–Mart's decisions. If Belline was right in thinking the manager's donation unauthorized, the victim is K–Mart itself. No state case I could find says that Illinois wants to crack down on firms that do not pay adequate attention to their interest in curtailing pilfering by their own employees.

*Palmateer* is one candidate for that honor. Palmateer alleged that he had been fired for agreeing to cooperate in the criminal investigation and prosecution of a fellow employee. Perhaps the fellow worker's crime was one committed against the firm; the court's opinion does not say. *Palmateer* does not establish that the identity of the victim is irrelevant; it did not discuss the question. Justice Heiple concluded in *Zaniecki* that "*Palmateer*, a 4–3 decision, [is] the outer limit[ ] of protection for at-will employees discharged in retaliation for the taking of some action favored by public policy." 97 Ill.Dec. at 758, 493 N.E.2d at 421. In this he has been prophetic. No decision by the Supreme Court of Illinois in the decade since *Palmateer* sustains a claim that a discharge violated "public policy". (I put to one side the drumbeat of cases arising out of allegations that the employer discharged someone who pursued a workers' compensation claim or its cousin, medical attention for an injury, see *Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill.2d 526, 116 Ill. Dec. 694, 519 N.E.2d 909 (1988).)

The only other candidate is *Petrick v. Monarch Printing Corp.*, 111 Ill.App.3d 502, 67 Ill.Dec. 352, 444 N.E.2d 588 (1st Dist.1982). Petrick, the comptroller of a small corporation, reported that the firm's president used some fancy maneuvers to acquire more of the firm's stock. The court held that the comptroller could not be sacked for making this report. The president's financial gimmick might be deemed embezzlement, an offense against the firm. It also could be characterized as stock fraud, a crime against the investors rather than the firm itself. *Petrick* labeled the comptroller's report one designed "to force Monarch to comply with the Illinois Criminal Code", implying that it conceived of the president's (and perhaps the firm's) offense as one committed against the investors. No one thinks that the manager of the K–Mart outlet committed securities fraud by allowing the Rotary Club to take some merchandise!

Other state cases hew to the line I have sketched. For example, both *Shores v. Senior Manor Nursing Center, Inc.*, 164 Ill.App.3d 503, 115 Ill.Dec. 946, 518 N.E.2d 471 (5th Dist.1988), and *Johnson v. World Color Press, Inc.*, 147 Ill.App.3d 746, 101

Ill.Dec. 251, 498 N.E.2d 575 (5th Dist.1986), involve reports of offenses by the employer against some well-defined rule of law designed to constrain the employer. *Shores* grew out of an internal report that a nurse was violating patients' rights, *Johnson* a report that the employer's accounting practices defrauded its investors. In each case the court thought it necessary to protect employees who tried to vindicate rules of law that the firm was (or might have been) interested in subverting. That is the pattern in the Supreme Court's cases, too.

Because theft is an *unconsented* taking, putting the identification of the crime in the hands of the person with authority to give or withhold consent, Belline's claim fails. No state case uses the *Kelsay–Palmateer* doctrine to prevent an employer with the power to define the offense from concluding that there has been no crime and discharging a complaining worker. Deployment of the state's power, through the tort law, is important only if there is some risk that the firm is using a discharge to undermine a legislative decision. Belline's discharge presents no such risk, and there is accordingly no reason to override the contract between Belline and K–Mart that leaves employment decisions to K–Mart.