**Michael PAOLELLA, Plaintiff,**

v.

**BROWNING–FERRIS, INC., Defendant.**

**Civil Action No. 94–7364.**

United States District Court,
E.D. Pennsylvania.

July 3, 1997.

Jay R. Levenberg, Law Offices of Jay R. Levenberg, Jenkintown, PA, for Plaintiff.

John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Mark M. Wilcox, Drinker, Biddle and Reath, Phila, PA, Browning Ferris, Inc., Defendant.

### MEMORANDUM

GAWTHROP, District Judge.

This wrongful discharge diversity action arises from the termination of Plaintiff Michael Paolella's employment with Defendant Browning–Ferris, Inc. At trial, the plaintiff argued that the defendant fired him in retaliation for his demands that it cease its deceptive billing practices. The jury found for Plaintiff, and awarded him $ 732,000 in damages. The defendant now renews its Motion

for Judgment as a Matter of Law under Fed.R.Civ.P. 50, or, in the alternative, moves for a new trial pursuant to Fed.R.Civ.P. 59. In the event the court grants the defendant's Motion for a New Trial, Plaintiff moves for a new trial on damages. Additionally, Defendant moves to correct an omission in civil judgment. *See* Fed.R.Civ.P. 60(a).

In its Renewed Motion for Judgment as a Matter of Law, Defendant argues that Plaintiff failed to prove that it committed an illegal act, and that he failed to show a causal link between his protest and his termination. The defendant also contends that Plaintiff may not benefit from the public policy exception to the employment-at-will doctrine because he participated in the alleged illegal activity. In its Motion for a New Trial, Defendant maintains that this court improperly instructed the jury on reliance, and thus impermissibly shifted the burden of proof. It also argues that Plaintiff's recovery is barred by the efficient breach doctrine, and that the jury's verdict as to both liability and damages is against the weight of the evidence. Finally, in its Motion to Correct an Omission in Civil Judgment, Defendant asserts that the court should amend its judgment to reflect the front pay and back pay figures found by the jury. Plaintiff contests each of these arguments. Upon the following reasoning, I shall deny the defendant's Renewed Motion for Judgment as a Matter of Law. I also shall deny the parties' motions for a new trial, provided that Plaintiff accepts a remittitur of damages to $ 600,000. I shall grant Defendant's Motion to Correct a Clerical Omission.

### I. *Background*

Defendant Browning–Ferris, Inc. ("BFI") is a Delaware corporation in the trash-hauling and recycling business. In November, 1989, Plaintiff Michael Paolella signed an employment agreement with BFI, and began working as a sales supervisor in King of

Prussia, Pennsylvania. BFI later promoted Mr. Paolella to sales manager and transferred him to Delaware. In 1992, BFI switched invoicing systems. Under this new system, BFI told its customers that it was simply passing along its costs, while in fact it was charging substantially more, all of which increase went to its own profits. The testimony revealed that BFI drafted invoices in which it exaggerated the amount customers paid for landfill costs by fabricating the weight of their trash. Plaintiff testified that he believed this system to be unethical and illegal, and that he orally expressed his concerns to BFI's Delaware district manager, Ronald Hanley, and to the head of the Atlantic region, Mr. Snyder. BFI demoted Mr. Paolella in the fall of 1992, and fired him on January 17, 1994. BFI maintained that it fired Mr. Paolella because of his poor performance. Mr. Paolella countered that he was fired for making repeated protests about BFI's billing practices.

After a four-day trial, the jury found for Plaintiff, and awarded him $ 732,000 in damages. The court then requested that the jury specify the amount of back pay and front pay included in that award. The jury informed the court that it was awarding Plaintiff $ 135,000 in back pay, and $ 597,000 in front pay. Now before the court are Defendant's Renewed Motion for Judgment as a Matter of Law, or, in the alternative, Motion for a New Trial, Plaintiff's Motion for a New Trial, and Defendant's Motion to Correct an Omission in Civil Judgment. Delaware law governs this dispute.[1]

### II. *Standard of Review*

Under Fed.R.Civ.P. 50(b), a court should grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference," insufficient evidence exists "from which a jury reasonably could find liability."

---

1. Although Mr. Paolella and BFI originally entered into a written agreement which included a Pennsylvania choice-of-law clause, BFI later transferred him to Delaware, where, with no written contract, he assumed a new position. He then performed work in Delaware for BFI's Delaware division. The conduct underlying this controversy took place in Delaware. Thus, Delaware law controls this case. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

*Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993). In deciding whether sufficient liability evidence exists, "the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." *Id.* Yet more than a mere scintilla of evidence must support the finding of liability. *See id.*

The Federal Rules permit district courts to order new trials "for any of the reasons for which new trials have heretofore been granted in actions at law in the Courts of the United States." Fed.R.Civ.P. 59(a). These reasons include prejudicial errors of law and verdicts against the weight of the evidence. *See Maylie v. National R.R. Passenger Corp.,* 791 F.Supp. 477, 480 (E.D.Pa.), *aff'd,* 983 F.2d 1051 (3d Cir.1992). A district court has broad latitude to order a new trial for prejudicial errors of law. *See Klein v. Hollings,* 992 F.2d 1285, 1289–90 (3d Cir.1993). By contrast, a court's discretion to order a new trial for a verdict contrary to the weight of evidence is more limited. It should so order only if it reasonably concludes that to allow the jury's verdict to stand would result in a "miscarriage of justice." *Id.* at 1290 (quoting *Williamson v. Consolidated R. Corp.,* 926 F.2d 1344, 1348 (3d Cir.1991)). A court may order remittitur if it detects "no clear judicial error or 'pernicious influence,'" but the verdict nonetheless "shock[s] the conscience of the court." *Kazan v. Wolinski,* 721 F.2d 911, 914 (3d Cir.1983).

### III. *Discussion*

### A. *Renewed Motion for Judgment as a Matter of Law*

Defendant's Renewed Motion for Judgment as a Matter of a Law raises several whistleblower issues. First, if an employee complains about illegal conduct, as opposed to mere questionable conduct, is he protected by Delaware's whistleblower exception to the employment-at-will doctrine? I conclude that he is. Second, does that protection extend to an employee even if his protests are only within the company? Under the circumstances of this case, I conclude that Plaintiff is protected. Third, is a plaintiff totally barred from recovery if he himself participated in his employer's illegal acts? Here, I conclude it is not a total bar, but that it does call for some reduction in Plaintiff's damage award. Fourth, and finally, did too much time elapse between Plaintiff's internal complaints and his termination to permit an inference of causation? I conclude that this was a jury question, on which they were fully charged, and which was fully argued, and that there was sufficient evidence of record to support their implicit finding of causation.

### 1. Criminal Activity

█ A preliminary issue is whether Plaintiff produced sufficient evidence to permit a jury to find reasonably that BFI had engaged in criminal activity. Under Delaware law,

A person commits theft when, with the intent ... [to deprive the owner of the property or appropriate it], he obtains property of another person by intentionally creating or reinforcing a false impression as to a present or past fact, or by preventing the other person from acquiring information which would adversely affect his judgment of a transaction.

11 Del.C. § 841. After receiving a charge with this statutory language, the jury found that BFI had obtained greater fees, the property of others, by creating a false impression that the rate increase reflected higher landfill costs alone. N.T. of Oct. 3, 1996, at 101. That is a crime. As such, it is explicit; it is recognizable.

There was sufficient evidence for a rational jury to conclude that BFI had engaged in this criminal activity. Mr. Paolella testified that Mr. Hanley told the sales force that he intended to use the waste authority's 25% rate increase to improve profits. N.T. of Sept. 30, 1996, at 64–70. Mr. Hanley also personally instructed Mr. Paolella to lie to a customer, Edward B. DeSeta, and all other customers about the average weight used to calculate their bills. N.T. of Sept. 30, 1996, at 88. Mr. Paolella's supervisor, Stephen Sanko, told him to fabricate weight tickets for another customer, Dempsey's Diner. N.T. of Oct. 1, 1996, at 20. Geoffrey Schenck, a former BFI employee, corrobo-

rated Mr. Paolella's testimony about the billing system, and the DeSeta and Dempsey Diner incidents. · N.T. of Oct. 1, 1996, at 54, 56, 57–60, 62. Thus, a jury reasonably could have found that BFI intentionally had used misleading invoices to convince customers that increased landfill costs alone accounted for their steeper bills.

### 2. Protection of Internal Whistleblowers

█ I have found no Delaware court case addressing the question of whether an employee, terminated for internally blowing the whistle on criminal conduct, may benefit from the public-policy exception to the doctrine of employment-at-will. On an issue of first impression, a court sitting in diversity "must forecast the position the supreme court of the forum would take." *See Clark v. Modern Group, Ltd.,* 9 F.3d 321, 326 (3d Cir.1993). In so doing, "a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts." *Becker v. Interstate Properties,* 569 F.2d 1203, 1206 (3d Cir.1977), *cert. denied,* 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978).

The Supreme Court of Delaware has held that every employment contract contains an implied, or socially imposed, covenant of good faith and fair dealing. *Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 101 (Del.1992). This covenant includes a public-policy exception to the employment-at-will doctrine. *See E.I. DuPont de Nemours & Co. v. Pressman,* 679 A.2d 436, 441–42 (Del.1996). In *Pressman,* the court declined to extend the covenant to protect an employee who had complained internally of "questionable" conduct,

but implied that he would have been protected had he blown the whistle on conduct that was criminal: " 'Employees who uncover and blow the whistle on questionable internal financial and business practices [*absent illegality*] have won no support from the courts.' " *Id.* at 442 (quoting William J. Holloway & Michael J. Leech, *Employment Termination: Rights & Remedies* 280 (2d ed.1993)) (alteration in original; emphasis added). When the court interpolates "absent illegality," it sends a signal that had the employee been protesting practices that were illegal, the result would have been diametrically different. This would be in line with many other courts, which have held that public policy protects employees who object internally to illegal activity. *See id.* at 442 n. 13 (citing cases).[2] I thus predict that the Delaware Supreme Court would find that the covenant extends to whistleblowers terminated for their internal complaints of criminal conduct.

### 3. Participation in the Criminal Activity

█ Mr. Paolella did participate in the criminal activity, and that is not to be condoned. He did, however, help to protect the public interest by complaining internally, and he at least tried to bring a halt to the activity by telling the F.B.I. To preclude even a penny of recovery to a whistleblower plaintiff because that plaintiff had some slight participation in that wrongdoing would be a disincentive to rooting out corruption, and would mute more than a few whistles. Such a rule seems unfairly harsh.

In the real world, it is a fact that not every observer of less-than-licit conduct is a third party, coyly staying an innocent and proper distance away from the misdeeds. The

---

**2.** *See, e.g., Smith v. Mitre Corp.,* 949 F.Supp. 943, 950 (D.Mass.1997) (finding that Massachusetts law protects government contractor's employee who reports illegality internally); *Byle v. Anacomp, Inc.,* 854 F.Supp. 738, 743 (D.Kan.1994) (concluding that plaintiff stated claim for retaliation under Kansas law for reporting violation of law to company management); *Petrik v. Monarch Printing Corp.,* 111 Ill.App.3d 502, 67 Ill.Dec. 352, 356, 444 N.E.2d 588, 592 (1982) (holding that plaintiff stated claim for discharge in retaliation for disclosing to management discrepancies in company's financial records). *Cf. Smith v.*

*Calgon Carbon Corp.,* 917 F.2d 1338, 1346 (3d Cir.1990) (finding no claim under Pennsylvania law for retaliatory discharge following terminated employee's reports to management of illegal activity where activity lay outside employee's scope of responsibility), *cert. denied,* 499 U.S. 966, 111 S.Ct. 1597, 113 L.Ed.2d 660 (1991); *O'Neill v. ARA Services, Inc.,* 457 F.Supp. 182, 187 (E.D.Pa.1978) (holding that plaintiff failed to state claim for retaliatory discharge where allegations did not establish connection between internal reports of misconduct and discharge).

courts are full of people who were participants in criminal schemes, testimonially blowing the whistle on others involved in the crime. The closer one is to wrongdoing, the greater the opportunity to observe and later reveal the transgressions of others.

In the context of negligence, the trend of law nationally, and in Delaware as well, has been to abolish the rule which totally bars recovery to a plaintiff should that plaintiff be found, even in the slightest degree, contributorily negligent. 10 Del.C. § 8132. The modern trend is to attenuate, rather than to obliterate, recovery. By analogy, that same principle should apply to this case, and I predict that Delaware would not totally preclude recovery here.

On the other hand, by analogy to the now well-established doctrine of comparative fault, I do believe that there should be some reduction in the plaintiff's recovery. To let the verdict stand, without any penalty for Mr. Paolella's own wrongdoing, would seem unjustly generous. His argument, that he went along with the scheme only out of economic duress, simply will not wash. That one needs the money, that one will suffer economic hardship if one does not play along with a scheme to skim from one's customers, has never been a defense to fraud. But to utterly nullify his award, to penalize him for his participatory wrongdoing, would be unjustly harsh. I thus shall let him keep his verdict, but with some attrition, with remittitur.

Whenever a judge assesses the amount by which a verdict is to be reduced, to quantify that portion of the verdict which "shocks the conscience," the task is a tad daunting. In sizing up—or down—damages, one may not, of course, speculate, indulge in arbitrary guesswork. Mathematically precise calipers are not available. One must use as much definiteness and accuracy as the circumstances permit. At bar, the plaintiff was not the instigator of the plan to cheat BFI's customers. He was not the leader, but a follower. He got caught up in it because he happened to occupy a position on the defendant's staff where it was his lot to do some of the wrongdoing, or else lose his job. It seems that, in the grand scheme of things, he was but one small cog in a rather large wheel. Viewing all of the circumstances, I have concluded that a reduction of $ 132,000 is appropriate. For Mr. Paolella to receive more than $ 600,000, under the circumstances just recited, would shock the judicial conscience.

### 4. Causation

 BFI also asserts that too much time elapsed between Mr. Paolella's objections to the billing policy and his termination to permit an inference of causation. Although Mr. Paolella's oral protests occurred in 1992, the final event of record before Plaintiff's termination on January 17, 1994 is a letter dated December 30, 1993. This letter's tone is brusque, sarcastic, and hostile. Virtually all of it is addressed to Plaintiff's plaints as to his commissions' being withheld and his responses to accusations of poor job performance and poor attitude. It concludes with a request to implement the following program:

1. Immediately cease all illegal activities

2. Immediately cease all discrimination

3. Refund all monies due for earned commissions, etc.

4. Adopt an overall attitude change

The jury had this exhibit to consider, with all its ramifications. Apparently, the jury attached significant weight to the first entry, "Immediately cease all illegal activities," particularly in light of Plaintiff's testimony that he was referring to BFI's billing policy. N.T. of Oct. 1, 1996, at 37. It appears that the jury found Plaintiff's forced separation from BFI, coming just three weeks later, to have some causal correlation with this language. All relevant evidence on the question of causation was before the jury. Given the evidence, and the law, I would be overreaching to say that, in achieving its verdict, the jury itself had overreached.

### B. *Motion for a New Trial*

In its Motion for a New Trial, BFI argues that I improperly instructed the jury on reliance; that is, that the charge impermissibly allowed the jury to infer that BFI's customers had relied on its misrepresentations, even

though there was no direct evidence on that point, no testimony from any such customer.

It also maintains that, under the efficient breach doctrine, a breach of contract is not a crime. *See Pressman,* 679 A.2d at 445. Finally, BFI argues that the verdict is against the weight of the evidence. Mr. Paolella responds that he did present evidence demonstrating that BFI had deceived its customers, and that such evidence could be used to infer reliance. He also contends that, if the court applied the doctrine of efficient breach in this context, it would be excusing illegal activity. The jury's verdict, he concludes, is supported by the evidence and should not be disturbed. On these points, I agree with the plaintiff.

### 1. Jury Charge

■ In charging the jury, BFI argues that the court somehow shifted the burden of proof when I discussed the meaning of consent and plaintiff's allegation that something on the wrong side of the law was occurring. I did indeed set forth plaintiff's theory of the case, but that was immediately followed with a statement of defendant's theory of the case. The court expressly took no position as to which side should prevail. N.T. of October 3, 1996, at 96, 102, 104, 108–09, 120.

The charge did not shift the burden of proof to BFI to disprove reliance by the customers. It merely instructed the jury that they had the right to infer such reliance, if there were sufficient circumstances to permit that inference to be drawn. In fact, an inference is simply a "logical tool" which shifts neither the burden of persuasion nor the burden of proof because "the trier of fact can reject the inference in whole or in part." *Commonwealth v. Shaffer,* 447 Pa. 91, 288 A.2d 727, 735–36, *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972). *See also County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224–25, 60 L.Ed.2d 777 (1979) ("The most common evidentiary device is the entirely permissive inference or presumption, which allows—but

does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant"). Here, both Mr. Paolella and Mr. Schenck testified about the disputed billing system, and that this system inflated the average weight of the customers' trash. Mr. Paolella also testified that BFI's management twice instructed him to lie to customers about the weight of their trash, and that the customers stayed with BFI after being given the inflated figures. From this evidence, the jury reasonably could have inferred that the customers had relied on the billing system and the fabricated weight figures that BFI had produced. More generally, with respect to the question of consent, it is true that no customers were called to say that they had not consented to an increase in BFI's profits under the guise of higher landfill fees. It is also true that the jury was charged that, in deciding this case, they should use, among other things, their own observations and experiences in the affairs of life, and their common sense. N.T. of Sept. 30, 1996, at 3–4. They were enjoined not to leave those worthy decisional tools outside of the jury room. It is a matter of common sense, and of general knowledge of human nature, that people are not inclined knowingly to consent to being economically gouged. For example, suppose that there is opaque, misleading language in a contract which has been slipped under the eye, and pen, of a customer. When that business unilaterally seeks to modify monetary and contractual terms in an agreement containing misleading, confusing language and formula, undiscernible by any but the most wary, vigilant, and sophisticated consumer, it cannot be said that the person who did not catch the fraud consented to be bilked. The human-nature reasons for that are obvious. The plaintiff needed to bring in neither the economic victim, nor a psychologist, to talk about the niceties of human nature and the fact that people do not like to have their wallets fraudulently thinned.[3]

---

**3.** In the criminal context, if an observer sees some kindly gentleman's pocket being picked, instantly notifies the police, and the fleeing pickpocket is arrested, then, at trial, the person whose wallet was filched need not testify that he did not consent to its appropriation. That inference is self-evident.

Consent was a jury question, one which could be resolved through the application of their own experience and common sense. Common sense and general knowledge of human nature were sufficient to carry Plaintiff's day, and the verdict should not now be disturbed on that basis.

### 2. Efficient Breach

■■■ The doctrine of efficient breach says that the law should not deter an otherwise socially beneficial, or "efficient," breach of contract by forcing the promisor to compensate the promisee for more than the promisee's actual losses. *See, e.g., Patton v. Mid–Continent Systems, Inc.,* 841 F.2d 742, 750 (7th Cir.1988). *See also Pressman,* 679 A.2d at 447–48. Defendant, under the rubric of the efficient breach doctrine, reiterates that there can be no criminality here because a breach of contract is not an illegal act. That is indeed the general rule. *See, e.g., Windsor Sec., Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 664 (3d Cir.1993) (finding that a breach of contract, in itself, is not criminal conduct). There are, however, breaches of contract, and acts accompanying breaches of contract, which do constitute illegal acts. Antitrust cases provide one example. Another is the case at bar, where contractual undertakings are intertwined with criminal. This general contractual doctrine does not here bar recovery.

### 3. Liability Evidence

■■ BFI also maintains that the jury's verdict on liability ran contrary to the weight of the evidence. As is so often seen in employment cases, BFI presented a good deal of evidence to the effect that Mr. Paolella was a worthy candidate for being sacked— for reasons having nothing to do with his blowing of whistles. BFI presented evidence that Plaintiff was a whiner with a bad attitude, that he did not get along well with others, that he was always grumbling about getting more and more commissions, for example. Mr. Paolella, on the other hand,

presented evidence of BFI's criminal conduct and testified that he called BFI on its illegalities. Further, he produced a letter sent to them just three weeks before his termination, reiterating his concerns about BFI's illegal activity. Although the letter discussed far more than illegal activity, focusing as it did on Mr. Paolella's concern that his commissions were not sufficiently hefty, the entire letter was before the jury, was fully argued to the jury, and the jury reached their decision. For this court to intrude upon their credibility findings at this juncture, when those findings are supported by evidence, would be to ,trespass into their exclusive domain.

### 4. Damage Evidence

The jury returned a verdict of $ 732,000. They reached this verdict after hearing testimony that Mr. Paolella had earned approximately $ 50,000 annually at BFI, had earned only $ 21,000 since his termination, and that if he had worked at BFI until age sixty-five, he would have earned income for another fourteen years. In summation, Plaintiff's counsel argued for an award of $ 109,000 in back pay, $ 490,000 in front pay, and an unspecified sum for cost-of-living increases, medical benefits, and pension benefits.

I do agree, as discussed above, that the verdict is too high in light of Mr. Paolella's participation in what this jury found to be a nefarious scheme. Thus, I have retrenched the award to $ 600,000. However, I cannot say that the record reveals evidence of passion or prejudice. *See Dunn v. HOVIC,* 1 F.3d 1371, 1383 (3d Cir.) (*en banc*) (finding that size of verdict alone, if supported by evidence, cannot show prejudice and passion), *cert. denied,* 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993). Under the circumstances of this case, I cannot say that the verdict, as abridged, is anything other than a just result, well within the sound discretion of the parties' peers. The amount

---

The question of consent also can be clarified by analogy to physical, rather than economic, violation. One recalls a prosecution for rape and murder, where the defendant had strangled his victim to death after having raped her. It was

not necessary, nor, of course, possible, to put the victim on the stand to testify that she did not consent to her rape. That element was proved by circumstantial evidence alone. *See Commonwealth v. Garnett,* 458 Pa. 4, 326 A.2d 335 (1974).

of damages neither justifies a new trial, nor remittitur beyond that already discussed.

### C. *Motion to Correct Clerical Omission*

 BFI wishes this court to include in the civil judgment the jury's specific findings of front and back pay. Mr. Paolella opposes this motion, arguing that the court should not have given the jury an additional interrogatory after it had returned with its verdict. He has cited no law to support his position. In fact, the request for additional interrogatories does have precedent. *See Bolden v. Southeastern Pa. Transp. Auth.*, 820 F.Supp. 949, 952 (E.D.Pa.1993), *aff'd*, 21 F.3d 29 (3d Cir.1994) (permitting submission of second set of interrogatories to jury after jury made initial damages finding). Thus, I shall grant BFI's motion to include in the judgment the jury's front pay and back pay findings.

### IV. *Conclusion*

In sum, I shall deny BFI's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial. I condition the denial of a new trial on the plaintiff's agreement to take a remittitur. I shall deny as moot Plaintiff's conditional Motion for a New Trial on damages.

An order follows.

### *ORDER*

AND NOW, this 3rd day of July, 1997, for the reasons described in the accompanying memorandum:

1. The defendant's Renewed Motion for Judgment as a Matter of Law and alternative Motion for a New Trial are DE-NIED. I condition the denial of the new trial motion on the plaintiff's agreement to accept a remittitur of damages to $600,000.

2. The defendant's Motion to Correct a Clerical Omission in Civil Judgment is GRANTED. The second paragraph of the Civil Judgment of October 3, 1996, is AMENDED to read:

"IT IS ORDERED that judgment be and the same is hereby entered in favor of the plaintiff, Michael Paolella, and against the defendant, Browning–Ferris,

Inc., in the amount of $732,000, consisting of $135,000 in back pay and $597,000 in front pay."

3. The plaintiff's Motion for a New Trial is DENIED as moot.