

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-1998

# Paolella v. Browning Ferris Inc

Precedential or Non-Precedential:

Docket 97-1599

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Paolella v. Browning Ferris Inc" (1998). *1998 Decisions.* Paper 244.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/244

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1599

MICHAEL PAOLELLA

v.

BROWNING-FERRIS, INC.,
        Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 94-cv-07364)

Argued June 4, 1998

Before: SCIRICA, NYGAARD and SEITZ*, Circuit Judges

(Filed October 13, 1998)

DAVID H. MARION, ESQUIRE
  (ARGUED)
JOHN E. CARUSO, ESQUIRE
HOWARD J. BASHMAN, ESQUIRE
Montgomery, McCracken, Walker
 & Rhoads
123 South Broad Street
Philadelphia, Pennsylvania 19109

 Attorneys for Appellant

_____

*Judge Seitz heard argument in this matter but was unable to clear
the opinion due to illness.

              ARLIN M. ADAMS, ESQUIRE
                (ARGUED)
              NANCY WINKELMAN, ESQUIRE
              Schnader, Harrison, Segal
                & Lewis
              1600 Market Street, Suite 3600
              Philadelphia, Pennsylvania 19103

                Attorneys for Appellee

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this diversity action, we are asked to predict certain parameters of the employment-at-will doctrine under Delaware law. Relying on the "public policy exception" to the doctrine, plaintiff claimed he was unlawfully terminated for protesting his employer's illegal billing scheme. After a jury rendered a verdict for plaintiff, defendant employer moved for judgment as a matter of law or, in the alternative, a new trial. The district court denied both motions. Paolella v. Browning-Ferris, Inc., 973 F. Supp. 508, 510 (E.D. Pa. 1997). We will affirm.

I.

In October 1989, Michael Paolella began working as a sales supervisor for Browning-Ferris, Inc. in its office in King of Prussia, Pennsylvania. In February 1990, Paolella was promoted to sales supervisor and transferred to BFI's Wilmington, Delaware division. His responsibilities included servicing existing commercial waste disposal accounts and obtaining new business for BFI. Paolella soon developed and instituted a marketing plan which resulted in increased profits for the Delaware division. At the start of the next fiscal year, October 1, 1990, Paolella was promoted to sales manager.

BFI's customer relationships were governed by service agreements, which usually ran for a three year term and provided for a flat monthly billing rate. Although the

2

customer was only informed of the bottom line figure, the billing rate was actually comprised of two separate components: a service fee, representing the cost of collecting and transporting the trash to the landfill each week, and a disposal fee, representing the cost of dumping the trash at the landfill. While the monthly rate was based on the volume of the customer's trash, measured in cubic yards, the state-run landfill charged BFI based on the weight of the trash dumped. Consequently, BFI based the disposal portion of its contract price on an average weight of 90 pounds per cubic yard. The service agreements allowed BFI to increase the monthly rate in three ways: 1) BFI could pass along state increases in dumping costs at the landfill; 2) BFI could impose cost-of-living increases on the service fee; or 3) BFI could increase the rate in other situations, provided it gave the customer 30 days advance notice and received customer consent.[1]

In late 1991, the Delaware Solid Waste Authority announced plans to increase landfill disposal rates by 25%, effective July 1, 1992. Ronald Hanley, BFI's Delaware District manager, discussed the rate increase at a January 1992 sales meeting, and announced two changes in BFI's billing procedures. First, he unveiled a new invoicing system to begin February 1, 1992, whereby customer invoices would display both the disposal fee and the service fee. This would allow customers to see that the impending 25% fee increase was the result of the state's increased disposal fees, rather than an increase in BFI's service charges.

According to Paolella, Hanley also announced a plan to increase the disposal fee artificially by assigning a new average weight of 120 pounds per cubic yard, and decreasing the service fee by a corresponding amount. The initial result of this modification was that the customer would continue to pay the same flat monthly fee. But once the state imposed 25% increase in dumping costs took effect, BFI would earn additional profits because that

_____

1. Explicit, written consent was not required. The agreement provided a "[c]ustomer's consent may be evidenced by the practices and action of the parties." App. at 788.

3

increase would be applied to the artificially inflated average weight of 120 pounds per cubic yard. While the total amount of the increase would be disclosed under the new billing system, the customer would assume the full increase was attributable to the state imposed increase in disposal charges.

Acknowledging he did not object to the plan at the meeting, Paolella testified at trial that he subsequently raised concerns about the legality of the rate increase with Hanley at least twice weekly, from January through April 1992, during their daily commute. Paolella also testified he raised similar concerns with Fred Snyder, BFI's vice-president for the Atlantic region, during a private meeting in April 1992.[2] According to Paolella, both men dismissed his protests, and Snyder advised Paolella to do as Hanley instructed.[3] Despite his objections, in June 1992 Paolella complied with instructions to draft a letter to all BFI customers advising them of the 25% increase.[4] He also negotiated contracts with customers based on the new rates.

Paolella testified that, in November 1992, a customer, Edwin DeSeta, advised him that a BFI competitor had offered a better rate. After a weight study of DeSeta's trash indicated that it weighed much less than the average weight of 120 pounds per cubic yard, Paolella asked Hanley if BFI

_____

2. Both Snyder and Hanley testified that Paolella did not lodge any objections with them. App. at 353 (Snyder); App. at 526–27 (Hanley).

3. The day after this discussion with Snyder, Hanley instructed Paolella not to send a previously approved mass mailing informing customers they could reduce their disposal costs by increased recycling. According to Paolella, Hanley's explanation for the decision to cancel the mailing was that "you [Paolella] don't work the BFI way."

4. The notice explained the impending rate hike as follows:

    Effective July 1, 1992 there will be an increase in the fees that the
    Delaware Solid Waste Authority charges for all solid waste disposal
    at its landfill.

    Therefore, BFI must increase its charge for solid waste removal. This
    will take effect with our July 1992 invoicing.

App. at 805.

4

could reduce DeSeta's rate. According to Paolella and his subordinate, Geoffrey Schenck, Hanley instructed them to inform DeSeta that his trash weighed 120 pounds and the rate could not be reduced. Paolella then instructed Schenck to explain this to DeSeta. Paolella testified he complied because he feared losing his job. One month later, Paolella was replaced by Stephen Stanko as sales manager. Despite not having received any prior written warning or other indication that his performance was unsatisfactory, Paolella was demoted to sales representative.

Paolella also testified to two other instances of fraudulent billing by BFI. First, Paolella testified that in 1993 he discovered BFI had increased its weight disposal fee for Dempsey's Diner, claiming the average weight of Dempsey's trash was 200 pounds. Although Dempsey's contract did not permit BFI to increase its fees based on an increase in the trash weight, Dempsey's agreed to pay the higher rate if BFI could substantiate the weight increase. According to Paolella, Stanko directed Paolella to prepare three false weight tickets. Paolella testified he did as directed because he feared repercussions if he disobeyed.

Second, Paolella testified that he learned BFI was continuing to bill Fayva Shoes, although Fayva had stopped using BFI's services some months earlier. When Paolella suggested to Hanley that Fayva should receive a credit for the overpayments, Hanley told him, "as long as they keep paying us, you keep billing them."

In late 1993, the tension between Paolella and BFI reached a breaking point. On August 27, 1993, Paolella sent BFI a certified letter concerning unpaid commissions he claimed BFI owed him. On September 24, 1993, BFI sent Paolella a written warning about his performance. On December 2, 1993, Paolella sent BFI another letter about the commissions. BFI replied by sending Paolella another warning on December 23, 1993. Paolella then sent BFI two more letters on December 30, 1993. In one of them, Paolella warned BFI to "immediately cease all illegal activities," a statement he claimed referred to Hanley's fraudulent billing scheme. On January 17, 1994, BFI terminated Paolella for "poor performance."

5

II.

On December 6, 1994, Paolella filed a complaint against BFI and its parent company, Browning-Ferris Industries, Inc., alleging wrongful discharge.5 After a four day trial, the jury returned a verdict for the plaintiff and awarded $732,000 in damages. At the court's request, the jury specified that $135,000 represented back pay, while the remaining $597,000 constituted front pay. BFI filed a renewed motion for judgment as a matter of law and, in the alternative, a motion for a new trial.6  As noted, the district court denied both motions.

III.

The district court examined Delaware case law to determine whether whistleblowing employees were entitled to protection under the public policy exception to the employment-at-will doctrine. Finding no cases directly on point, the court predicted whether the Delaware Supreme Court would afford such protection. Based primarily on its interpretation of the Delaware Supreme Court's decision in E.I. Dupont de Nemours and Co. v. Pressman, 679 A.2d 436 (Del. 1996), the district court held Delaware would extend the protection of the public policy exception to an employee who "blew the whistle" on an employer's illegal (as opposed to merely questionable) conduct. Paolella, 973 F. Supp. at 512.

The court then examined whether there was sufficient evidence to support the jury's finding that BFI had engaged in illegal activity. Citing Paolella's testimony concerning Hanley's creation of the fraudulent billing scheme, Hanley's instructions to lie to customer DeSeta, Stanko's instructions to fabricate weight tickets, and the corroboration of much of Paolella's testimony by Schenck,

_____

5. The claims against Browning-Ferris Industries, Inc. were dismissed for lack of personal jurisdiction.

6. BFI also moved the district court to amend the judgment to indicate the jury's apportionment of the verdict to front pay and back pay. The district court granted that motion, and none of the parties has appealed this determination.

6

the court concluded the evidence was sufficient. The court also found the public policy exception could still apply even if Paolella participated in the unlawful activity: "[t]o preclude even a penny of recovery to a whistleblower plaintiff because that plaintiff had some slight participation in that wrongdoing would be a disincentive to rooting out corruption, and would mute more than a few whistles." Id. Drawing an analogy to the concept of comparative fault in negligence, the district court held that, although the Delaware courts would not create an absolute bar to recovery, some reduction in the jury verdict was appropriate because of Paolella's participation. 7 Consequently, the court ordered a remittitur of $132,000.

The district court also rejected BFI's argument that there was insufficient evidence of causation because considerable time had elapsed between Paolella's complaints and his termination. Although BFI contended the letters sent by Paolella did not address the fraudulent billing scheme, the court found the jury could have reasonably concluded the reference to "illegal activity" in Paolella's December 30, 1993 letter was part of his protests to BFI. Because BFI terminated Paolella less than a month after receiving the letter, the court concluded that causation was adequately proven.

With respect to the motion for a new trial, the court rejected the argument that its charge improperly instructed the jury on the issue of reliance. In particular, BFI claimed the charge allowed the jury to infer that BFI's customers relied on the alleged misrepresentations, despite the absence of any direct testimony from BFI's customers. According to BFI, this relieved Paolella of his burden of proving reliance, and placed the onus on BFI to disprove that its customers relied on the alleged misrepresentations. The court disagreed, holding the charge instructed the jury

_____

7. The court rejected Paolella's argument that no reduction in the damage award was warranted because he was "coerced" into participating because he feared losing his job: "[t]hat one needs money, that one will suffer economic hardship if one does not play along with a scheme to skim from one's customers, has never been a defense to fraud." Paolella, 973 F. Supp. at 513.

7

that it could infer customer reliance on BFI's statements "if there were sufficient circumstances to permit that inference to be drawn." Id. at 514. The court reasoned that, despite the absence of direct customer testimony, the jury could reasonably infer that a customer would not accept an unwarranted price increase if it were fully informed of the basis for that increase. Id. at 514 ("It is a matter of common sense, and of general knowledge of human nature, that people are not inclined knowingly to consent to being economically gouged.").

IV.

BFI appeals on several grounds. First, BFI contends the district court misinterpreted Delaware case law and improperly extended the scope of the "public policy exception" to include situations where the employee was directly involved in the allegedly illegal activity. Second, BFI argues that, regardless whether an employee's involvement bars his recovery, this case does not fit within the parameters of the public policy exception because Paolella was not responsible for the allegedly unlawful activity, and did not produce sufficient evidence at trial, in particular testimony from BFI's customers, to prove that BFI's conduct was illegal. Third, BFI contends Paolella failed to prove his opposition to BFI's billing scheme was the cause of his termination. Finally, BFI claims the court erred when it found sufficient evidence to support the jury award, and contests the court's application of comparative fault principles in the context of a wrongful discharge action.

We exercise plenary review of the district court's denial of a motion for judgment as a matter of law, Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993), as well as its predictions applying state law. Staff Builders of Phila., Inc. v. Koschitzki, 989 F.2d 692, 694 (3d Cir. 1993). A motion for judgment as a matter of law should be granted only if, "viewing all the evidence . . . in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993) (citation omitted).

We review the district court's denial of a motion for a new trial for abuse of discretion, "unless the court's denial of the

8

motion is based on the application of a legal precept, in which case the standard of review is plenary." Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992). A question of fact concerning the new trial motion is reviewed for clear error. United States v. Perdomo, 929 F.2d 967, 969 (3d Cir. 1991). The district court's grant of remittitur is also reviewed for abuse of discretion. Dunn v. Hovic, 1 F.3d 1362, 1364 (3d Cir.), modified on other grounds, 13 F.3d 58 (3d Cir.), cert. denied, 510 U.S. 1031 (1993). Finally, we review BFI's challenge to the amount of the jury award to determine if "the verdict is `so grossly excessive as to shock the judicial conscience.' " Gumbs v. Pueblo Int'l Inc., 823 F.2d 768, 771 (3d Cir. 1987) (citations omitted).

V.

A district court exercising diversity jurisdiction must apply the substantive law of the state whose law governs the action. Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 n.15 (3d Cir. 1996) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). "When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue." Id. Absent a definitive statement of the applicable law by the state's highest court, a district court may also consider the decisions of state intermediate appellate courts in order to facilitate its prediction. Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991), cert. denied, 507 U.S. 973 (1993).

A.

1.

The employment-at-will doctrine "has a long history in Delaware and the United States." E.I. Dupont de Nemours and Co. v. Pressman, 679 A.2d 436, 440 (Del. 1996). Under the doctrine, there is a "heavy presumption that a contract for employment, unless otherwise expressly stated, is at-will in nature, with duration indefinite." Merrill v. Crothall-American, Inc., 606 A.2d. 96, 102 (Del. 1992). But the doctrine is not entirely unfettered, and courts have

9

demonstrated a willingness to "impos[e] constraints on an expansive interpretation of employers' prerogatives under at will employment contracts . . . ." Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 586 (Del. Ch. 1994). In particular, Delaware courts have established two distinct limitations on the employment-at-will doctrine, one grounded in contract, the other in public policy.

The contractual limitation adopted by the Delaware Supreme Court in Merrill, based on an implied covenant of good faith and fair dealing, bars termination in cases of fraud, deceit or misrepresentation by the employer. 606 A.2d at 101-02. Although the facts of that case did not require the court to address the availability of other exceptions to the at-will doctrine, the court noted that, in certain circumstances, "some other public policy [may be] implicated" by an employee's termination. Id. at 102.

The Delaware Court of Chancery later applied this "public policy" exception in the case of an in-house attorney who was allegedly fired for attempting to expose various abuses by her employer's corporate parent. See Shearin v. E.F. Hutton Group, Inc., 652 A.2d 578, 586 (Del. Ch. 1994). Delving into uncharted territory, the Chancellor held that an at-will employee may state a valid claim for breach of her employment contract where her termination was in violation of a "specific, articulated public policy." Id. But the court held this exception was limited in two respects. "[E]mployees who seek protection from firing on the basis that their actions were protected by a public policy, must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest." Id. at 587-88.

The Delaware Supreme Court again took up the public policy exception in Pressman. In that case, plaintiff Pressman discovered that his superior, Pensak, was serving as a technical adviser to a medical imaging technology company, a position Pressman feared created a conflict of interest. Pressman alleged that, after confronting his superior, Pensak engaged in a retaliatory campaign to have him fired. Defendant DuPont contended that the employment-at-will doctrine barred Pressman's suit. While

10

the court's analysis focused primarily on the applicability of the covenant of good faith and fair dealing set forth in Merrill, it also examined the public policy exception to the at-will doctrine, but concluded that Pressman's claim did not satisfy the requirements established in Shearin.

The central question raised here is whether Delaware would apply the public policy exception in a situation where the employee has participated in the employer's illegal activity. BFI argues that, under Delaware law, the public policy exception to the employment-at-will doctrine is narrow. In addition to the limitations prescribed by Shearin, BFI contends that Pressman limits the application of the exception to those cases in which the employee refuses to participate in the illegal activity.

We disagree. We do not believe Pressman adds a "non-participation" requirement to the public policy exception delineated in Shearin. Although the Pressman court quoted approvingly from Shearin, noting the limitations set forth, it did not address whether an employee's participation would prevent his recovery for wrongful discharge.8

_____

8. BFI argues that Pressman "emphasized, by its own description, that the exception will only protect employees who refuse to participate in unlawful conduct." BFI Brief at 15 (citing Pressman, 679 A.2d at 441-42 & n.13). That "description" appears to be the parenthetical description of a Superior Court case cited in a Pressman footnote, in which the Delaware Supreme Court described the Superior Court's holding with the phrase "refusing to commit crime." Pressman, 679 A.2d at 442 n.13 (citing Henze v. Alloy Surfaces Co., Inc., C.A. No. 91C-06-20, 1992 WL 51861, Bifferato, J. (Del Super. Ct., March 16, 1992)). BFI interprets this
to mean the public policy exception only applies if the employee refuses to participate in the employer's criminal act.

We disagree with BFI's interpretation. The Delaware Supreme Court cited that case for the proposition that "[t]he Superior Court has . . . permitted an exception to the at-will rule for public policy." Pressman, 679 A.2d at 442 n.13. The use of the phrase "refusing to commit crime" is a description of the factual premise of the case, and cannot be read to limit an employee's recovery to instances where the employee refrained from participating in its employer's unlawful activity. Any doubt as to the weight to be afforded this parenthetical description can be eliminated by consideration of the next Superior Court case in that citation string, which is described with the phrase "refusing to take polygraph."

11

Despite the absence of explicit language in Pressman adopting this "non-participation" requirement, BFI presses its argument by noting that none of the "plaintiffs in the cases cited as authority in Pressman would have stated a valid cause of action under the public policy exception had he or she not refused to violate the law." BFI Brief at 18. But, once again, these cases give no indication that the application of the public policy exception turned on the employee's refusal to violate the law. BFI has cited no case in which a Delaware court has refused to apply the public policy exception because an employee was involved in the illegal activity at the direction of its employer. Since neither Pressman nor Shearin conditioned the applicability of the public policy exception on the employee's abstention from the employer's wrongdoing, we believe the district court's prediction of Delaware law is correct. As the district court noted, "[i]n the real world, it is a fact that not every observer of less-than-licit conduct is a third party, coyly standing an innocent and proper distance away from the misdeeds." Paolella, 973 F. Supp. at 512. Although the exceptions to the at-will doctrine are to be narrowly drawn, the policy reasons for protecting whistleblowers remain whether or not the employee can avoid involvement in the illegal activity. For these reasons, we do not believe a non-participation requirement is mandated by Delaware law.

2.

BFI also contends the public policy exception does not apply to the facts of this case. As noted in Shearin, an employee seeking protection from the public policy exception "must assert a public interest recognized by some legislative, administrative or judicial authority, and must occupy a position with responsibility for that particular interest." 652 A.2d at 587-88. According to BFI, Paolella's complaints did not address a specific public interest, and even if so, he was not in a position of responsibility to warrant the protection of the public policy exception. BFI maintains that "Pressman authoritatively establishes that questioning the propriety of the employer's business practices . . . `does not rise to the level of a legally cognizable public policy exception.' " BFI Brief at 14. Under

12

this view, Paolella's private objections to Hanley and Snyder do not bring his termination within the scope of the exception.

In Pressman, the court found the employee's claim that he was fired for questioning the propriety of his superior's business practices was outside the purview of the public policy exception. 679 A.2d at 442 (holding that "Pressman's claim cannot fit within the public policy category since he does not identify an explicit and recognizable public policy."). In particular, the court noted that " `[e]mployees who uncover and blow the whistle on questionable internal financial and business practices [absent illegality] have won no support from the courts.' " 679 A.2d 436, 442 (alteration in original) (quoting Holloway & Leech, Employment Termination: Rights and Remedies 180 (2d ed. 1993)). Consequently, it appears that Delaware will not invoke the public policy exception absent some illegal act by the employer.

Once that limitation is understood, Pressman can be distinguished on its facts. The plaintiff in Pressman questioned the ethical propriety of his superior's relationship with a client of the company. By contrast, Paolella contended that his employers' billing scheme was illegally designed to defraud BFI's customers by leading them to believe the increase in their monthly fees was due solely to a state imposed increase in BFI's dumping costs and was therefore authorized under the terms of the service agreements. Thus, while both Paolella and Pressman questioned the propriety of their employer's business practices, Paolella raised legal, as opposed to ethical, concerns about his employer's conduct.

BFI also claims the public policy exception is inapplicable because Paolella did not have responsibility for the company's billing policies. We disagree. As the record shows, Paolella was a sales manager at the time of the allegedly unlawful billing practices and was responsible for negotiating service contracts, billing BFI's customers, and handling customer complaints. Although the case law does not elucidate the level of "responsibility" an employee must have in order to qualify under the public policy exception, we believe Paolella's position as sales manager puts him in

13

a position of responsibility sufficient to invoke its protection.

Consequently, we believe the district court, in predicting Delaware law, correctly found the public policy exception applicable under the facts of this case.

B.

BFI's contends that, even if the public policy exception applies, the evidence was insufficient to support a finding that its conduct was illegal. Consistent with its interpretation of Delaware law, the district court charged the jury that, in order to find for Paolella, it must find BFI had violated Delaware's theft by false pretenses statute. That statute provides:

> A person commits theft when, with the intent prescribed in S 841 of this title [to deprive another person of property or to appropriate another person's property], the person obtains property of another person by intentionally creating or reinforcing a false impression as to a present or past fact, or by preventing the other person from acquiring information which would adversely affect the other person's judgment of a transaction.

11 Del. Code S 843 (1998). The district court held there was sufficient evidence to allow a jury to find BFI violated the theft by false pretenses statute because BFI "had obtained greater fees, the property of others, by creating a false impression that the rate increase reflected higher landfill costs alone." Paolella, 973 F. Supp. at 511.

On appeal, BFI maintains the actions alleged by Paolella did not violate Delaware law.9 BFI contends that it did not

_____

9. BFI urges us to find that its actions were not illegal as a matter of law,
reasoning that our decision in Clark v. Modern Group Ltd., 9 F.3d 321 (3d Cir. 1993), allows a court to "resolve as a matter of law whether a certain course of conduct to which an employee has objected is illegal." BFI Brief at 29. Clark is inapplicable here. In Clark, the sole issue was the legal question whether the tax laws required inclusion of certain excess expense reimbursements on employees' W-2 forms. There were no

14

mislead its customers because the bottom line rate it charged was fully disclosed to BFI's customers, and that the invoices it prepared indicated the rate increase was not due solely to the landfill charge increase. BFI also asserts that "no customer appeared to testify that he was under a false impression, or was prevented from acquiring information which would adversely affect his judgment of his transaction with BFI." BFI Brief at 23. Consequently, BFI contends that the evidence does not support afinding that it violated Delaware's theft by false pretenses statute.

We disagree. Viewing all of the evidence presented in the light most favorable to Paolella, we do not believe "the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994). Although Paolella did not offer the testimony of customers claiming they were deceived, we do not believe the absence of such testimony is fatal.10  As noted, there

_____

factual disputes. As Clark noted, however, "a decision on the legality or illegality of a particular act often requires a resolution of disputed issues
of fact . . . ." 9 F.3d at 333. In this instance, the determination of whether BFI violated 11 Del. Code S 843 necessarily turns on certain factual issues relating to BFI's conduct and the jury's evaluation of the relevant testimony. Consequently, we decline to determine this question as a matter of law.

10. On appeal, BFI once more raises the argument that Paolella failed to meet his burden of demonstrating BFI's customers relied on the alleged misrepresentations because he presented no customer testimony at trial. BFI reasons that, absent direct evidence of reliance, Paolella cannot prove a violation of 11 Del. Code S 843. In particular, BFI maintains the jury charge "on a theory of a lack of informed consent allowed the jury to believe that without any customer testimony it could infer an [unlawful] act," effectively reversing the burden of proof on the issue of reliance. BFI Brief at 31.

We do not believe the jury charge on the issue of reliance was an abuse of the court's discretion. The court's charge set out the arguments offered by both sides, and informed the jury that they should apply common sense and their own experience to the evidence and testimony presented at trial. We do not believe that allowing the jury to draw reasonable inferences shifted the burden of proof to BFI. To the contrary, Paolella had the burden of demonstrating that BFI made false representations to its customers regarding the nature of the impending price increase.

15

was testimony concerning Hanley's creation of the fraudulent billing scheme, Hanley's instructions to both Paolella and Schenck to lie to DeSeta, and the fabrication of the weight tickets for Dempsey's Diner. In addition, Paolella testified that he sent each customer, at BFI's direction, a memorandum stating that BFI was increasing its charges for solid waste disposal as a result of the Delaware Solid Waste Authority's increased charges to BFI. Taken together, we believe the jury could have reasonably concluded that BFI intentionally created a false impression among its customers that the price increase was solely the result of the state imposed increase in BFI's dumping costs.

C.

BFI also contends its actions did not violate the statute because it was within its contractual rights to raise the disposal fee. According to BFI, the agreements "unambiguously placed the burden of objecting to a rate adjustment on the customer, and expressly advised customers that their consent could be inferred from their conduct." BFI Brief at 33. Consequently, BFI argues the failure of the customers to object indicates their consent to the price increase. In the alternative, BFI argues that while its conduct may amount to a breach of contract, this does not constitute an illegal act that would trigger the protection of the public policy exception.

We do not believe that BFI's actions can only be classified as a breach of contract. As the district court noted, a breach of contract can be accompanied by other actions that violate the law. That BFI's actions may constitute a breach of its service agreements does not preclude afinding that its accompanying actions violated Delaware's theft by false pretenses statute. In this instance, it is BFI's alleged misrepresentations to its customers, rather than its breach of the service agreements, which serve as the basis for a finding that BFI violated Delaware's theft by false pretenses statute.

We also disagree with BFI's argument that its July 1992 fee increase was permissible under the service agreements. As noted, BFI's service agreements allowed for three

16

categories of rate increases. The first two, which did not require customer consent, allowed BFI to raise its rates in order to pass along state imposed increases in dumping costs and to impose cost-of-living increases. The third category allowed BFI to raise its fees for any other reason, provided it gives the customer 30 days advance notice and received customer consent. But customer silence cannot constitute customer consent when the July 1992 rate increase was not solely attributable to the state-imposed increase in BFI's dumping costs.[11]

Because the jury found that BFI intentionally misled its customers as to the basis for the fee increase, and because we believe the evidence offered at trial was sufficient to support such a finding, we reject BFI's arguments.

D.

Claiming twenty months passed between Paolella's last complaint in April 1992 and his termination, BFI contends Paolella failed to satisfy his burden of demonstrating that his complaints of illegality were the cause of his termination. Furthermore, BFI contends it had good cause to terminate Paolella, citing his inadequate performance in 1993 and the hostile attitude displayed in his letters to Stanko and Hanley.

BFI's contention that twenty months passed between Paolella's last complaint and his termination in January 1994 turns on its interpretation of the correspondence sent by Paolella in December 1993. Paolella claims that his December 30, 1993 letter, in which he demanded BFI "immediately cease all illegal activities," was a direct reference to BFI's fraudulent billing scheme, and his termination less than three weeks later is sufficient support for the jury's finding of causation. BFI contends that the "illegal activities" must refer to the alleged withholding of Paolella's commissions.[12] We disagree. In light of Paolella's

_____

11. We also disagree with BFI's unsupported contention that it obtained its customers' "voluntary, informed consent" to raise its fees at the time the service agreements were signed.

12. BFI contends that, because the letter was unambiguous, we should determine its meaning as a matter of law. BFI Brief at 35 (citing Western

17

repeated complaints about BFI's billing scheme, the reference to "illegal activities" could reasonably be interpreted as a reference to either BFI's billing scheme or its withholding of Paolella's commissions. The issue was properly left to the jury. See Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991) ("New trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.")

BFI also claims it had good cause for terminating Paolella, noting Paolella conceded "the only reasons provided to him at the January 17, 1994 meeting as the reason for his discharge were his poor performance and attitude . . . [and therefore] established as a matter of law BFI's justification for terminating him for insubordination." BFI Brief at 38. That an employer did not provide bad faith or discriminatory reasons for an employee's termination does not insulate the employer from liability "as a matter of law." Consequently, BFI's argument is reduced to an attack on the weight the jury accorded the evidence. While acknowledging "BFI presented a good deal of evidence to the effect that Mr. Paolella was a worthy candidate for being sacked," the district court found there was sufficient evidence to support the jury's findings. Paolella, 973 F. Supp. at 515. We agree. Viewing the evidence in the light most favorable to the verdict winner, we do not believe BFI has shown that no rational jury could have found for Paolella.

E.

BFI contends there was insufficient evidence to support the jury award of $597,000 in front pay, and contends that

---

United Life Assurance Co. v. Hayden, 64 F.3d 833, 837 (3d Cir. 1995)). But Western United Life addressed a court's obligation to construe an unambiguous contract as a matter of law. The document at issue here was a letter, rather than a legally enforceable agreement. More importantly, we believe the December 30, 1993 letter was not unambiguous. This was a jury issue.

18

such an exorbitant award "may be indicative of passion and prejudice." BFI Brief at 43. In addition, BFI objects to the district court's application of a "comparative fault" theory, contending that, even if the court were correct, it should have submitted the calculation of comparative fault to the jury.

With respect to the size of the jury award, BFI notes that Paolella did not offer expert actuarial testimony to support his claim, and contends the size of the award demonstrates the jury ignored the district court's charge.13 According to BFI, the front pay award is more than 17 times the difference between Paolella's highest annual salary and the $20,000 he earned the year after his termination, and is therefore "contrary to right reason."

We disagree. The amount of the jury award in this instance does not shock the conscience. In addition, we do not believe the absence of expert testimony renders the jury calculation improper. Paolella presented evidence that his salary at BFI from 1991 through 1993 ranged from $45,000 to $53,000 and that his earnings in 1995 were $20,000. Based on this information, the jury could reasonably calculate a front pay award according to the district court's instructions.14 Consequently, we do not believe the evidence

_____

13. BFI takes no exception to the jury charge with respect to damage calculation. The court charged the jury:

> If you determine to award damages to plaintiff, it is not appropriate
> to merely award pay until such time as plaintiff qualifies for a
> pension or otherwise might be expected to retire. Such an award in
> pay to a 51 year old employee is unwarranted, because of future
> uncertainties, and you must act cautiously in considering an award
> of front pay for a long period of time. You must consider other
> factors such as the availability of employment opportunities, the
> period within which one by reasonable efforts may become
> reemployed, the employee's work and life expectancy, and discount
> tables to determine the present value of future damages, and other
> factors that are pertinent to a prospective damage award. If you find
> that plaintiff failed to present testimony and evidence regarding
> those factors, you should not award him front pay for an extended
> period of time.

App. at 696-97.

14. Assuming a fourteen year work expectancy, the front pay award averages out to an annual income of $ 42,642, afigure that falls between the highest salary Paolella had earned (over $50,000) and the $20,000

he reportedly earned the year following his termination.

19

is insufficient to support the award, or that the jury's calculation is improper.

With respect to calculation of an appropriate remittitur, BFI contends there was no basis to conclude the Delaware courts would apply comparative negligence principles in this situation, and that even if those principles applied here, the jury, rather than the court, should have determined the degree of fault attributable to both parties.

We do not believe the court's analysis was an abuse of discretion.[15] We note the district court did not actually apply comparative negligence principles to calculate the remittitur, and did not attempt to allocate degrees of fault between the parties. The district court reasoned that, much as a plaintiff in a negligence action should not be rewarded if he is partly at fault, an employee who participates in an illegal activity on behalf of his employer ought not receive the full benefit from his action for wrongful discharge. Consequently, the court concluded that the jury award would shock the conscience of the court unless it was reduced appropriately. We see no abuse of discretion here.

VI.

For the foregoing reasons, we will affirm the district court's denial of defendant's motion for judgment as a matter of law and its motion for a new trial.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

15. BFI also contends the district court's analogy to comparative negligence was an improper basis for the court's conclusion that an employee may recover for wrongful discharge under the public policy exception even if the employee is engaged in the illegal activity. For the reasons discussed supra, we believe the district court correctly predicted the Delaware courts would allow an employee to recover in such a case, and consequently need not address this argument.

20